[L. A. No. 3389.    Department Two.—March 31, 1915.]

## THE NATIONAL OIL REFINING AND MANUFACTURING COMPANY (a Corporation), Respondent, v. PRODUCERS REFINING COMPANY, Appellant.

Action for Breach of Contract—Evidence—Motive of Plaintiff in Bringing Action.—In an action by an oil refining company to recover damages for the breach by the defendant of its agreement to supply the plaintiff with all of the crude oil required to keep the plaintiffs' refinery running to its full capacity during a stipulated period, the defendant is not entitled, on the cross-examination of the plaintiff's witnesses, to show that the plaintiff's motive in bringing the suit was not to recover damages actually sustained, but merely to impress its stockholders that it had large assets growing out of the asserted damages which it had sustained at the hands of defendant.

Id.—Evidence of Motive When Admissible.—The cases in which motive, apart from its establishment by interest, relationship, bias, or prejudice, and aside from criminal cases, becomes a proper subject-matter of inquiry, are ones where it is held that malice or malicious motives may make an otherwise lawful act unlawful and actionable.

Id.—Motive Arising from Interest, Relationship, Bias, or Prejudice.—The motive to which section 1847 of the Code of Civil Procedure refers when it declares that the presumption that a witness speaks the truth may be repelled by evidence affecting his motives, means motives arising from interest, relationship, bias, or prejudice.

Id.—Pleading—Allegation of Furnishing Oil.—An allegation in the complaint in such action that during a part of the contract period, the defendant "furnished and delivered to the plaintiff crude oil," is neither an allegation nor an admission that during such period the defendant furnished sufficient oil to meet the capacity of the plaintiff's refinery.

Id.—Breach of Contract to Furnish Oil and Repurchase Product—Measure of Damages.—The measure of damages for such breach is that fixed by section 3300 of the Civil Code, declaring that the measure is the amount which will compensate the party aggrieved for all the detriment proximately caused by the breach. In arriving at the amount of the damages, the plaintiff's loss of profits is an element to be considered; and where it was pleaded and proven that plaintiff, after the breach, was unable to purchase crude oil in the open market, the court properly estimated the loss of profit to the plaintiff by reason of the failure of the defendant to furnish oil at the price fixed by the contract, and to repurchase the products after refinement, also at the price so fixed.

APPEAL from a judgment of the Superior Court of Kern County and from an order refusing a new trial.   J. W. Mahon, Judge.

The facts are stated in the opinion of the court.

F. E. Borton, for Appellant.

Kaye & Siemon, for Respondent.

HENSHAW, J.—Plaintiff and defendant entered into a contract, by the terms of which the latter agreed to supply the former with all of the crude oil required to keep the former's refinery running to its full capacity from January 29 to December 31, 1907.   The full capacity was understood to be the capacity of this refinery on January 29th.   The defendant was to sell this oil at a stipulated price, and in turn was to purchase from the plaintiff the products of the refinery, these products being the distillates and the asphaltum residuum.   This action was brought laying damages for defendant's breach of this contract.   Plaintiff alleged that the capacity of its refinery was 8927.18 barrels of distillate and 812.29 tons of asphaltum per month; that it had not been furnished sufficient crude oil to keep the refinery running continuously to its capacity; whereby plaintiff was obliged to close down repeatedly, to its great damage.   It was further alleged that the plaintiff could not procure oil in the open market to supply the deficiency.   On the trial the quantity of oil that was actually delivered to the plaintiff by the defendant was agreed upon by stipulation to be 58,224.28 barrels.   A basic question upon the trial was, obviously, the capacity of plaintiff's refinery at the time when the contract became effective.   If defendant did not furnish oil to that capacity in accordance with its contract, and its failure so to do was not occasioned by causes which the contract itself provided should relieve the defendant from liability, such as fires, strikes, and accidents, then defendant had violated its contract, and the remaining question in the case was the measure and amount of damages.

Plaintiff offered evidence upon the capacity of its refinery. The court found that capacity to be twelve thousand barrels of crude oil per month, or eighty thousand barrels for the period from May to November, this being the period during

which plaintiff charged that defendant had breached the contract by failure to supply oil in sufficient quantities. Twelve thousand barrels a month was well within the capacity shown by plaintiff's evidence.

Appellant does not argue that it did not violate the contract, but urges as serious error certain rulings of the court touching the admission of evidence, and also it insists that the court adopted an inaccurate measure of damages.

George Calhoun was the manager of plaintiff's business. He signed on behalf of the plaintiff the contract the breach of which is the subject-matter of this litigation. He was plaintiff's principal witness in the case. He was interested financially in the affairs of plaintiff as a stockholder as well as manager. Upon cross-examination the witness was asked numerous questions, to which objections were interposed and sustained as not being proper cross-examination. These were matters concerning which the witness had not been interrogated upon his examination in chief. The attorney for the defendant made a long statement to the court of what he proposed to show by this cross-examination. The statement itself covers several printed pages. Summarized it amounted to this: That the witness manager was having trouble with his stockholders; that to keep them quiet he had promised them a dividend of thirty thousand dollars; that he sought to make this thirty thousand dollars by this unwarranted and unjustifiable suit prosecuted against defendant; that further to show the unjustifiableness of the action, defendant wished to prove that the witness had made several or many sets of figures, endeavoring fictitiously to swell the amount of damages which plaintiff claimed; "that it was with the utmost difficulty and required the greatest ingenuity to get items of alleged damage that would make any plausible showing of approximately $30,000"; that plaintiff, after beginning this suit, for the purpose of soothing the stockholders, "got a big newspaper write-up"; that therefore the plaintiff's motive was not to recover damages actually sustained, but merely to impress its stockholders that plaintiff had large assets growing out of the asserted damages which it had sustained at the hands of defendant. The same effort was made with the witness McGrath, who had formerly been the secretary of the plaintiff, McGrath being a witness for defendant. The court ruled against the admissibility of such

evidence, and its ruling was wise and proper. It permitted all evidence touching the interest of the witness and his relationship to plaintiff. The court even offered to allow evidence that Calhoun had made different figures and estimates going to the damages which plaintiff had sustained. Indeed, the court's declaration upon this offer was, if anything, an expression of its willingness not alone to go as far as the law allowed in the matter of the reception of evidence, but perhaps a trifle further. But very properly, as we have said, did it refuse to allow this wandering excursion into the domain of motive. The interest of a witness may be shown. His bias and prejudice may be shown. But if in cases such as this the motive, separated from these elements, is the subject of evidence, civil trials beginning now will end with eternity. By this we mean motive apart from those admissible inquiries prosecuted within reasonable bounds, which may be regarded as involving motive—the inquiries as to relationship, interest, bias, and prejudice. A man may have a right to foreclose a mortgage against A and refuse to do so out of friendship. He may have the same cause of action against B and insist upon prosecuting it because of his dislike for B. In the latter case his motive does not affect his right of action nor the measure of his recovery, and it is not, therefore, a proper subject-matter of inquiry. The cases in which motive, apart from its establishment by interest, relationship, bias or prejudice, and aside from criminal cases, becomes a proper subject-matter of inquiry, are ones where it is held that malice or a malicious motive may make an otherwise lawful act unlawful and actionable. (See note to *Globe & Rutgers Fire Ins. Co.* v. *Firemen's Fund Ins. Co.*, 29 Lawyers Rep. Ann., New Series, 869.) No such contention is here advanced, and for the rest, upon plain grounds of expediency and in accordance with the public policy which declares it to be to the interest of the state that there should be an end to litigation, these far journeys into the speculative realm of motive are not permitted. The motive to which section 1847 of the Code of Civil Procedure refers when it declares that the presumption that a witness speaks the truth may be repelled by evidence affecting his motives, means the kind of motive we have been discussing. Finally it may be added that if for a moment it could be thought (the vital interest of this witness having been shown) that evidence

of this remote motive,—namely, that he was having trouble with his stockholders, could have exercised a more compelling influence upon the witness to deceive, the answer is that he could not have deceived the court as to the measure of damages, for that was a matter of law, and as to the capacity of the refinery his evidence may be rejected entirely and there is left uncontradicted evidence of other witnesses, in nowise discredited, showing a capacity even greater than that which the court found.

Appellant next contends that the obligation which defendant undertook was to supply sufficient crude oil for the capacity which the refinery had in January, the month when the contract was entered into. This is true. Appellant then argues that the complaint alleges, and by alleging admits, that defendant furnished oil up to the capacity of the refinery for the months of February, March, and April. Defendant then shows the amount of crude oil that was furnished in those three months, and averaging the amount finds that 5482.18 barrels per month was the full capacity of the refinery. Wherefore, as appellant argues, it follows that the finding of the court that the capacity was twelve thousand barrels per month is beyond the admission of the pleadings. In its argument appellant states that it was alleged by the plaintiff and admitted that "the defendant furnished crude oil in accordance with and as required by the contract." It was neither so alleged nor so admitted, the complaint in this regard stating merely that defendant began the delivery of crude oil and "up to and including the month of April, 1907, furnished and delivered to the plaintiff crude oil." This is far from being either an allegation or admission that during this period of time defendant furnished sufficient crude oil. It is a declaration merely that defendant furnished some and that if there was a shortage in the delivery plaintiff is not seeking a recovery on account of it. This is fully explained by reason of the fact that defendant's pipe-line was incapable during that time of supplying the necessary quantity; that defendant seemed to be using its best endeavors to correct the situation and furnish the oil and that plaintiff in its action has seen fit to waive any claim for compensation for the shortage during that time. Appellant likewise insists that the same matter—the monthly capacity of the refinery—is covered by a stipulation of the parties. We need

not elaborate upon this nor say anything further than that the contention finds as little support as does the one we have just been considering,—namely, that plaintiff's pleadings admit the capacity. Indeed, it would be remarkable if this were the case, since the actual capacity was upon the trial made the subject of voluminous evidence and was one of the important issues in the case.

Next it is insisted that the court erred as to the measure of damages. It is said that the damages should be measured under sections 3353 and 3354 of the Civil Code, which have relation to violations of contract for the purchase and sale of personal property. The court for the measure of damages applied section 3300, which declares that the measure is the amount which will compensate the party aggrieved for all the detriment proximately caused by the breach. What the court did was to estimate the loss of profit to the plaintiff by reason of the failure of the defendant to furnish oil at a fixed price and to repurchase the products after refinement, also at a fixed price. It was pleaded and proved that plaintiff, after the breach, was unable to purchase crude oil in the open market. The measure of damages adopted by the court was the precise one applicable to the case, and the case itself is exceptional in that to determine those profits no resort is necessary to the uncertainty of current market value, the price being fixed by the contract. That the loss of profits in a case such as this is a just element in the admeasurement of damages is abundantly established. (*Shoemaker* v. *Acker*, 116 Cal. 239; [48 Pac. 62]; *Tahoe Ice Co.* v. *Union Ice Co.*, 109 Cal. 242, [41 Pac. 1020]; *McKay* v. *Riley*, 65 Cal. 623, [4 Pac. 667].)

No other matters seem to merit specific consideration.

For the reasons given the judgment and order appealed from are affirmed.

Lorigan, J., and Melvin, J., concurred.