[Civ. No. 3851.  Second Appellate District, Division Two.—June 26, 1922.]

## LONG BEACH FISHERIES COMPANY (a Corporation), Respondent, v. THE CURTIS CORPORATION (a Corporation), Appellant.

[1] Contracts—Refusal to Deliver Fish—Action for Damages—Availability of Fish in Nearest Market—Expert Evidence.—In an action for damages for breach of a contract to deliver fish, it is error to permit a witness for the plaintiff to testify over defendant's objection that no foundation had been laid and that the question called for the conclusion of the witness, that there were no fish of the character covered by the contract obtainable during the term thereof, without first requiring proof showing the witness to be qualified to answer such question.

[2] Id.—Damages—Loss of Profits.—In such an action, in the matter of proof of actual damages, it is proper to receive evidence of profits which would reasonably have accrued to plaintiff from the fish which defendant contracted to deliver had they been delivered according to the contract.

[3] Id.—Damages—Proof.—In such an action, unless the plaintiff can prove that no fish were to be had at that time in the market nearest to the place where the fish should have been delivered, its only other course is to introduce evidence to show the price at which fish could have been purchased in such market at or about the time of the breach of the contract by defendant.

[4] Id. — Risk of Spoilage and Transportation — Construction of Agreement.—The contract between plaintiff and defendant having required defendant to deliver to plaintiff the fish received by defendant from certain boats, the risk of spoilage and transportation thereon being taken by plaintiff, but that contract having been modified at the request and for the benefit of plaintiff so as to permit defendant to use such fish when received in small catches and later to deliver to plaintiff at one time and in a large quantity the equivalent of the several small catches received and used by it, such modification did not place on defendant a greater burden than was imposed upon it by the original contract, and it was entitled to credit for all fish which it in good faith procured and delivered to plaintiff in accordance with such modification, and the risk of spoilage and transportation thereon was on plaintiff.

[5] Id.—Daily Average—Weekly Basis—Evidence.—In this action for damages for breach of a contract whereby defendant agreed

5.  Rule for measuring damages in action by vendee for breach of contract for installment delivery of goods, notes, 6 **Ann. Cas.** 166.

to use its best ability to furnish plaintiff "with an approximate delivery of twenty tons per day of blue fin tuna average," the circumstances surrounding the making of the contract, and the construction placed upon it by the parties, showed that the parties intended the average to be made of the days of each week, beginning with the first day on which purchases by defendant were made, and not of the days of the entire season covered by the agreement.

[6] Id.—Default—Rescission.—Defendant having been in default in the deliveries of fish required to be made by it to plaintiff under the contract, it could not make plaintiff's refusal to pay a shrinkage charge on fish subsequently delivered the basis for a rescission of the contract.

[7] Pleading—Amendment—Discretion—Prejudice. — The allowance of an amendment to the complaint after the taking of evidence is largely discretionary with the trial court, and an order of that character will not be disturbed unless prejudice has resulted.

APPEAL from a judgment of the Superior Court of Los Angeles County. Chas. Wellborn, Judge. Reversed.

The facts are stated in the opinion of the court.

Daly, Daly & Todd and James H. Daly for Appellant.

P. E. Keeler for Respondent.

CRAIG, J.—This action is one for an accounting and for damages alleged to have resulted from the breach of a contract. For convenience the plaintiff and respondent will be referred to as the company, and the defendant and appellant as the corporation. Both are engaged in the business of canning fish. The agreement in question constituted a joint fishing arrangement. One of the principal objects intended to be accomplished was to make such provision that both would be able to run their fish canning operations continuously. The writing reads as follows:

"This agreement entered into this first day of August, 1919, the consideration of which is the mutual advantages enjoyed by both parties thereto by and between the Curtis Corporation, party of the first part, and Long Beach Fisheries Company, party of the second part; both parties hereto agree as follows:

"First: The second party agrees to assign all their right, title and interest to the first party in certain boats and

barge equipment which they may have heretofore arranged for during the tuna season of 1919.

"Second: Second party agrees to pay first party the sum of ten dollars per ton as the expense of barging and tendering upon fish purchased by first party and delivered to second party.

"Third: Second party agrees in addition to said ten dollars per ton barging and tendering charge to pay first party the sum of ninety-five dollars per ton for each and every ton of blue fin tuna delivered to second party's cannery by first party, provided, however, should the first party find it necessary or convenient to pay more or less than ninety-five dollars per ton for said blue fin tuna that the price so paid by first party, more or less than ninety-five dollars per ton, should be paid by second party to first party, the second party having been first notified by first party of their intention to pay such different amount.

"Fourth: First party agrees to use their best ability to the purchase of sufficient blue fin tuna during the tuna season of 1919 to furnish the second party with an approximate delivery of twenty tons per day of blue fin tuna average, it being understood the first party retains the privilege of first supplying itself with a daily capacity of twenty tons from purchases made, with the exception, however, that the second party shall not be expected to take fish from the first party on either one of Friday, Saturday or Sunday nights of each week, at the first party's option.

"Fifth: Should the first party in endeavoring to fulfill this agreement purchase fish which shall become unfit for canning while same is in the possession of either party hereto the financial loss upon said spoiled fish shall be borne by the two parties hereto in the same ratio as the amount of spoiled fish shall bear to the amounts of fish received by the respective parties hereto during that calendar month in which such spoiled fish shall have been obtained.

"Sixth: It is mutually agreed and understood that the first party in maintaining sufficient barge and tender service for the carrying out of this agreement shall, so far as possible, accept on account of the second party and deliver to the second party at a sole charge of ten dollars per ton

all such fish as may be delivered to the barge of the first party from any one of the following boats: Washington, I. S. E. 1, I. S. E. 2, The Explorer and Protector, the risk of spoilage and transportation, however, being taken by second party hereto without recourse.

"Seventh: It is the intention of this contract that the fish canneries of the respective parties hereto shall, so far as possible, be kept supplied with such fish as may enable them to operate each working day of the week, provided, however, that all the other provisions of this contract are considered as paramount.

"Eighth: The fish in this contract are defined as being blue fin tuna solely and not referring in any way to albacore or other species of fish, with the exception of the fish caught by the five particular boats named.

"Ninth: In the event of spoiled fish being suffered by either parties hereto desiring to take advantage of the provisions in paragraph five hereof said party shall immediately notify the other party hereto and hold said spoiled fish for a minimum period of twenty-four hours for the inspection of the other party hereto.

"Tenth: The tuna season whenever mentioned herein is defined as ending October 1st, 1919.

"Eleventh: In the event that during any one of seven days starting from the first of September, 1919, during the period of this agreement, party of the first part is unable to purchase in the aggregate sixty tons of blue fin tuna for the use of either or both parties hereto said first party is authorized to thereupon, at its option cease said tender and barge service and said second party is in the event of the discontinuance of said barge and tender service under said condition to reimburse said first party at the rate of twenty dollars per diem from date of discontinuance to October 1st, 1919.

> "THE CURTIS CORPORATION
> "(Party of the First Part),
> "By ALEX B. STEWART,
> "Pres. ~
>
> "LONG BEACH FISHERIES COMPANY
> "(Party of the Second Part),
> "By R. A. NICKELL,
> "Pres."

The trial court found that this agreement was modified by mutual consent of the parties by the following letter:

"Long Beach, Cal., August 1st, 1919.

"The Curtis Corporation,

"Long Beach, California.

"Gentlemen:

"As provided in our agreement of this date you are to accept the delivery of fish from 'The Explorer' and 'Protector' two seigne boats operating out of this port, until further notice from us in writing. You will therefore please consider this fish your own fish and purchase same as if it were such.

"You are also authorized not to make any charge against us of fifty cents per ton, or any·other amount, for state tax for fish purchased as we hereby agree to take care of this matter ourselves with the State Fish and Game Commission and pay the tax, whatever it is, on all fish delivered to us by yourselves.

"Yours very truly,

"Long Beach Fisheries Company,

"By R. A. Nickell."

Several of appellant's contentions have merit, but the error committed in the admission of evidence upon the subject of damages under the second cause of action is of such a character as.to require a new trial.

Assuming that the evidence showed the corporation to have broken its contract concerning the delivery of blue fin tuna, it was incumbent upon the company, in order to make out a case for damages for such breach, to prove by competent evidence its actual loss resulting therefrom. It might have proved the reasonable market value of other fish of the same character at the nearest market or that there was no fish of that character obtainable during the term of the contract. [1] An attempt was made to prove that there were no fish to be had. The witness Nickell was asked the following question:

"Mr. Keeler: State whether or not there were fish available in markets of Los Angeles and Long Beach harbors during the months of August and September, consisting of blue fin or albacore, which could have been purchased by anyone desiring to do so, willing to pay the market price and having the money to pay for the same, to supply your

cannery with the quantities of fish which were covered by
this contract, and which you claim here were not delivered
with the Curtis Corporation under the ·contract in ques-
tion.''

Counsel for the corporation objected on the ground that
no proper foundation had been laid and that the question
called for a conclusion of the witness.   Objection was over-
ruled.   It is apparent that the question was objectionable
upon the grounds stated.   There was no showing that the
witness had made any inquiry to discover whether or not
the fish in question were available in the markets of Los
Angeles or Long Beach during the months of August and
September, and as to whether or not such fish were avail-
able is clearly a question which ˙ the witness would not be
entitled to answer unless a foundation had been laid by
proof of his being an expert upon the matter.   [2]   In
the matter of proof of actual damages it was proper to
receive evidence of profits which would reasonably have
accrued to the company from the fish had they been de-
livered according to the contract.   (*Pacific Steam Whaling
Co.* v. *Alaska Packers' Assn.*, 138 Cal. 632 [72 Pac. 161].)
In this connection it was necessary for the company to show
the value of the tuna to the buyer over the amount which
would have been due to the seller under the contract if it
had been fulfilled.   (Civ. Code, sec. 3308.)   Section 3354 of
the Civil Code provides the rule for determining such value.
[3]   Unless the company could prove that no fish were to
be had at that time in the market nearest to the place
where the property should have been delivered, its only
other course would have been to have introduced evidence
to show the price at which it could have been purchased
in such market at or about the time of the breach of the
contract on the part of the corporation.   As before stated,
the company attempted to show that there were no fish on
the market, but, as the objection should have been sus-
tained to the testimony offered in that behalf, we must dis-
regard it.   Without the testimony of the witness Nickell on
that point that part of finding 13 which concerns damages
has no support in the evidence.

[4]   One of the principal reasons advanced by appellant
as ground for reversal is that the evidence is insufficient

to support certain other findings. In this regard complaint is made concerning finding 3, which is as follows:

"3. That plaintiff delivered to defendant, pursuant to said contract, 16,907# of albacore which defendant agreed to deliver to plaintiff in consideration of a barging charge of $10.00 per ton; that defendant delivered to plaintiff 9,996# of albacore and failed and refused to deliver to plaintiff the balance thereof, to wit, 6,911#; that the value of the albacore retained by defendant was, in the months of August, September and October, 1919, $140.00 per ton, and there is due to plaintiff from defendant for said albacore retained by it as aforesaid the sum of $483.77, less a barging charge on 4 & 99/100ths tons at $10.00 per ton, amounting to $49.98 making the net charge against defendant in favor of plaintiff for albacore $433.79."

The albacore referred to in this finding was stipulated to have been delivered by the company to the corporation under paragraph 6 of the contract. It appears that instead of immediately transporting this albacore, which was received by the corporation in small catches, to the company, the former used the fish thus turned over to it and later delivered a large quantity of albacore at one time. According to the witness Stewart this was done at the request of Nickell, president of the Long Beach Fisheries Company, so that it would receive sufficient albacore at once for a day's run. On September 7, 1919, the corporation delivered to the company at Long Beach 16,114 pounds of albacore, of which 6,118 pounds were admitted to be unfit for canning. The trial court by the finding here attached in effect disallowed this amount as a credit on behalf of the corporation. The question thus presented is simply whether or not the 6,118 pounds of fish should be considered as having been delivered pursuant to paragraph 6 of the agreement. If so, even though unfit for canning, it could not be charged against the corporation. The contract provides:

"Sixth: It is mutually agreed and understood that the first party in maintaining sufficient barge and tender service for the carrying out of this agreement shall, so far as possible, accept on account of the second party and deliver to the second party at a sole charge of ten dollars per ton all such fish as may be delivered to the barge

of the first party from any one of the following boats: Washington, I. S. E. 1, I. S. E. 2, The Explorer and Protector, the risk of spoilage and transportation, however, being taken by second party hereto without recourse.''

The testimony of the witness Stewart concerning the receipt and delivery of this albacore was: ''I asked Nickell if he desired us to make delivery on these little odd lots of albacore that were being delivered by the 'Ise 1,' and 'Ise 2,' and 'Washington,' as they were delivered, and he said 'No.' He said it was only a small quantity, and at that time he wasn't running on any hundred lots. He said he did not want to receive a few hundred pounds and start the factory up just to handle that much. He said, 'You take it and use it, and when you get enough to my credit so that I can make a run on it, make a day's run, why, then, you can pay me back in fish.' '' This evidence was uncontradicted. Surely, the defendant cannot now be heard to say that the change from the course of business contemplated by the contract, to wit, immediate redelivery of the specific albacore delivered by the company to the corporation, to a subsequent delivery of other albacore, which change was made at the request and for the benefit of the company, should be regarded as adding a burden upon the corporation which would not have existed had the original plan been carried out. The company is clearly estopped from successfully making the assertion that the redelivery which was made is not in accordance with the plan and intention of section 6 of the contract. There is no charge or showing that the corporation acted in bad faith in the matter of the delivery of the fish and particularly that which it appears was unfit for canning purposes. The corporation unloaded fish from the same cargo at the same time for its own use, each party taking albacore in the same condition without selection or discrimination. When Nickell told Stewart that the company did not wish the corporation to make delivery of the little odd lots of albacore as they were caught and delivered to the corporation's barges he knew that the identical fish delivered to such barges would never be returned to the company. He must have been aware of the fact that the corporation would follow the course which it did, and that it would eventually buy other albacore to return to the company. It cannot

be said that the parties intended to conduct this transaction apart from any reference to the contract which they had executed. It seems plain that they both intended that the procedure they followed should be regarded as carrying out their contract and as coming within the provisions of section 6 thereof. Under finding 3 the court charged defendant $433.79. This we think was error and that that part of the finding which states that the corporation refused to deliver the 6,118 pounds to the company is not supported by the evidence.

By finding 4 the trial court determined that the plaintiff's profits on the albacore, found by finding 3 to have been wrongfully withheld from delivery, would have been $100 per ton. It follows from what has been said that this amount was improperly charged against the corporation.

[5] The second count of the second amended complaint has to do with the blue fin tuna. By finding 13 the court found the principal allegations of this count to be true. Paragraph 4 of the contract is the one controlling the matter determined by the finding having to do with this count. In this behalf the court found that on certain dates, to wit, the twelfth and eighteenth days of August and the second, thirteenth, sixteenth, and seventeenth days of September, the corporation failed to deliver various amounts of blue fin tuna to the company, and to the delivery of which the company was entitled under paragraph 4 of the contract. In arriving at this conclusion the trial court construed paragraph 4 of the contract as permitting the corporation to retain the first twenty tons of blue fin tuna purchased and as requiring it to deliver all over said twenty tons to the company, not exceeding twenty tons per day. The trial court held that this provision applied to the daily purchases and that each day's purchase of the corporation was to be adjusted without regard to the other days in the tuna season and without regard to the season as a whole. Appellant contends that the contract should be construed as giving the right to it to retain as much of any day's purchase as it might desire provided that its daily average capacity for the entire season did not exceed twenty tons. We think that the latter claim is untenable. The matter is not free from difficulty. Paragraph 4 of the

contract is somewhat ambiguous. Therefore, the circumstances surrounding the making of the contract, as well as the construction placed upon it by the parties, must be taken into account.

Mr. Nickell, president of the company, testified as follows: "Mr. Stewart stated that he was quite positive he could purchase forty tons of blue fin tuna quite constantly each day, and that they, because of having the equipment, expected to receive the first twenty ton of fish which was purchased, and that we would receive the balance of the fish which was purchased up to an average delivery of twenty tons per day this specified time, and that was all we desired."

Mr. Stewart of the corporation gave this version of the same conversation: " . . . I stated to Mr. Nickell that it would not be right for the Curtis Corporation to turn over to the Long Beach Fisheries Company all of the fish of the Explorer and Protector as their fish until the Curtis Corporation had first secured their daily capacity, average daily capacity—we, of course, talked that way, 120 tons a week, is the terms that I used in talking to him—until we have first our 120 tons a week."

From this it appears that the period which the parties had in mind was a weekly period. This idea is supported also by the language of the contract itself. The concluding provision of paragraph 4 gives the corporation the right to retain all of the purchases of one of the days of the week—that is of Friday, Saturday, or Sunday at its option. Paragraph 11 carries out the idea of a weekly computation and reckoning by using this language:

"Eleventh: In the event that during any one of seven days starting from the first of September, 1919, during the period of this agreement, party of the first part is unable to purchase in the aggregate sixty tons of blue fin tuna for the use of either or both parties hereto said first party is authorized to thereupon, at its option, cease said tender and barge service and said second party is in the event of the discontinuance of said barge and tender service under said condition to reimburse said first party at the rate of twenty dollars per diem from date of discontinuance to October 1st, 1919."

Joint exhibit No. 2 is a statement of albacore delivered to the corporation by boat "Ise 2" and it is rendered in the form of a weekly statement. By the language of paragraph 4 of the contract the corporation agrees to use its best ability to furnish the company with twenty tons a day of blue fin tuna, but this is qualified by the use of the word "average." It is only an average of twenty tons per day that the corporation attempts to furnish. The parties do not clearly state what day's deliveries are to be averaged. The corporation contends that the intention was to average all of the days of the season. Such a construction would place the company at a very great disadvantage. The contract was drawn by the corporation and should not be construed to give it any undue advantage. If all of the days of the season must be averaged together the company would not know what its rights were until the end of the season. It might be that the corporation would take all of the fish purchased, for during some weeks but little or no purchases might be made. From all of these considerations we think the parties intended the average to be made of the days of the week beginning with the first day on which purchases were made. Joint exhibit No. 1 contains a statement showing the fish purchased each day. The first purchases were made on August 1st. The calculation should, therefore, begin with that date.

[6] Another contention of appellant which should receive notice is that the corporation ceased deliveries of blue fin tuna because the company had failed to pay shrinkage charges on a delivery of September 10th. It appears that it was in default prior to that time. At least as early as the week ending August 25th, even though retaining to itself an average of twenty tons per day, it should have delivered about 43,000 pounds of tuna to the company more than was delivered by it. Being thus in default it could not make the company's failure to pay a shrinkage charge the basis for a rescission of the contract. (*California Sugar etc. Agency* v. *Penoyer*, 167 Cal. 274 [139 Pac. 671].)

[7] Complaint is made that the court allowed an amendment to the complaint after the taking of the evidence. This amendment was permitted to make the pleading conform to the proof. The complaint was one for an account-

ing and contains allegations of the breach of the contract involved. A part of the evidence introduced in connection with the accounting established the contract and a breach of some of its provisions. The allowance of an amendment is largely discretionary with the trial court and an order of that character will not be disturbed unless prejudice has resulted. In this case it does not appear that the corporation's substantial rights were in any way compromised or that it was prevented from securing or introducing evidence because of having been surprised. In view of our decision requiring a retrial of the case no other points raised by appellant will require discussion. The judgment appealed from is reversed.

Finlayson, P. J., and Works, J., concurred.