[Civ. No. 13301.   First Dist., Div. Two.   Nov. 13, 1947.]

EUGENIO MORELLO, Appellant, v. GROWERS GRAPE
    PRODUCTS ASSOCIATION (a Corporation), Respon-
    dent.

366

Edward J. Lynch for Appellant.

Conley, Conley & Conley, Philip Conley, Boekel & Moran and John D. Gallaher for Respondent.

GOODELL, J.—This appeal was taken from a judgment for respondent for costs, entered on a directed verdict. The action was for damages in the sum of $35,853 for breach of contract alleged to have been entered into in November, 1942.

In 1938, there was a surplus of wine grapes in California. The respondent, a nonprofit corporation, was organized under state law, and functioned in connection with the California Agricultural Prorate Commission. The program for handling the surplus crop contemplated that the grapes would be crushed and made into brandy. The appellant owned a distillery near Fresno and was a member of the association. On October 4, 1938, he entered into an agreement with the association whereby he undertook to process a part of the grape crop. The agreement is lengthy, technical and complicated and its details need not be gone into here, for it is not the contract in suit. Under the 1938 agreement, title to the brandy was vested in the association, but each pro-

cessor had a preferential right to purchase as much of the brandy in the pool as he had processed. That particular provision (§ 13) read as follows: ". . . The association shall not . . . sell at any price any quantity of commercial brandy processed for the association by the processor to any person, unless the association shall have first offered to sell the same to the processor at the same price and upon the same conditions, and unless the processor shall have failed or refused to accept said offer in writing or by telegraphic notification delivered within five (5) days from the date of the making of such offer."

Pursuant to that provision the association on November 9, 1942, wrote to the appellant stating that the release had been ordered of the unsold brandy remaining in the pool, amounting to approximately 4,000,000 gallons. The letter contained the following offer: "The unsold brandy of your distillation remaining in the pool, according to our records, amounts to approximately 23,902.46 original proof gallons. This amount, which is subject to our final verification, or any quantity thereof, is offered to you at $1.25 cash, per original proof gallon, f.o.b. the storage racks within the Internal Revenue Bonded Warehouse where it is now held, provided

"1. That you accept this offer in writing or by telegraphic notification delivered within five days from the date of this letter, in accordance with Paragraph 13 of the Brandy and High-Proof Processing Agreement.

"2. That you sign and return to the Growers Grape Products Association, four copies of the Brandy Purchase and Sales Agreement (copy of this is enclosed, and additional copies will be furnished upon request.)"

The letter went on to say that if the offer was not accepted the association would "then be in a position to accept orders for any unsold brandy of your distillation (or the distillation for which you hold the purchase rights), from any interested party." It concluded, "It is our present intention, as in the past, to accept such offers, at the same price and upon the same terms that we are now offering to you."

On November 13, appellant wrote to the association as follows: "Confirming my telephone conversation with you this afternoon, I accept your offer of Nov. 9th and will purchase the 23,902.46 original proof gallons of commercial

brandy at $1.25 cash per gal., all as set forth in said letter; so if you will send the contracts down to me I will immediately sign and return the same."

The case is complicated by the fact that on November 16th, respondent received the following telegram: "I hereby assign all my right, title and interest in the present offering of commercial brandy to John A. Williar. Eugenio Morello." The circumstances surrounding its sending were as follows: Appellant is a member of an association known as Central California Wineries with an office in Fresno (and apparently not connected with the respondent association). On November 12th or 13th, at about the time when appellant had respondent's offer, he was sick in bed at his home, about 20 miles from Fresno, when he received a telephone call from one Caine who was talking from the Wineries' Fresno office. Caine told appellant that he had arranged to sell. Whether Caine was selling a preferential right in the surplus pool, similar to appellant's right, does not clearly appear, but we assume such was the case. After some discussion appellant told Caine that he was prepared to give an option to sell his own preferential right (respecting the 23,902.46 gallons) for 2½ cents a gallon, provided he received the money within five days. This telephone conversation was followed by a letter from appellant to Caine dated November 13th (the day appellant wrote to the association) reading: "As per our conversation over the phone last night, in which you represented Mr. Veith, I give you a 5 days option until the 18th of Nov. at 1 p. m. to buy my pro-rate brandy to net me 2½ cents per gal., and if I don't receive check for 2½ cents per gal. by that time then I am to be free to sell same to other parties." The Mr. Veith mentioned seems to have represented Williar, who in turn represented the Seagram organization.

While appellant was talking on the telephone with Caine, as already related, a Miss McKeighan (an assistant secretary of the Wineries, and well known by appellant for some years) was cut in on the conversation. She asked appellant if he wanted her to notify respondent of his willingness to sell his rights, and he authorized her to do so. On Saturday, November 14th, the telegram already quoted was sent from Fresno, stating that *appellant assigned to Williar*. Appellant's name was at the bottom of the telegram as the sender. By whom

it was composed does not appear, but presumably Miss Mc-Keighan caused it to be sent. It was received by respondent on Monday, the 16th, about the same time as respondent claims to have opened appellant's letter of the 13th.

Appellant admits having authorized Miss McKeighan over the telephone to send a "notification" to respondent but he disclaims any knowledge that it was to be sent by telegram and asserts, and repeats with emphasis, that *he never authorized her or anybody else to sign his name, or to say he assigned.*

The five-day option given by appellant to Caine was not exercised. When appellant failed to receive from respondent for signature the four copies of the formal contract, he called on respondent and was told that the telegram had been treated as superseding the acceptance; that respondent assumed from the telegram that appellant had no further interest in the subject matter of its offer of the 9th, and that it was at liberty to deal directly with Williar. On December 2d, respondent wrote appellant to the same effect. On December 3d, appellant made a written demand that respondent complete the transaction, in which he said: "I am hereby confirming my verbal notice to you that offer made to John A. Williar on November 14, 1942, for release by me of rights in said brandy to Williar was withdrawn and cancelled by reason of his failure to accept offer and pay purchase price within the time agreed. My notice to you of assignment to Mr. Williar is withdrawn." This was followed by a letter from appellant's attorney to respondent on December 9th, and the next month this action was commenced.

At the close of plaintiff's case respondent moved for a directed verdict on the ground that there had been no proof of damages. In granting the motion the court said: "I don't see how any jury can find any damages in this case, because there is no proof of damages. Moreover, in the Court's opinion, there is no proof of any contract which has been breached in this case, because the agreement between the plaintiff and the main defendant . . . had certain conditions which the evidence shows were not complied with, and therefore no contract. There was no acceptance of the offer within the terms of the paragraph 13 of the original agreement between the parties. So I am bound to grant the motion for the directed verdict."

The appellant attacks the ruling on both grounds stated by the court. The respondent defends it on the ground *inter alia* that no contract was made because appellant (a) "did not prove acceptance in writing or by telegram delivered to Growers Grape Products Association within five days after November 9, 1942, and (b) because Morello did not execute any brandy purchase and sale agreement . . . covering the purchase."

Naturally the primary inquiry is whether a contract was made, for if not, there is no need to discuss damages.

In the first place, the language of the acceptance squares with that of the offer, and there is no claim to the contrary.

On the question whether the acceptance was in time: paragraph 13 of the underlying agreement provides for an acceptance of the offer "in writing or by telegraphic notification delivered within five (5) days from the date of the making of such offer." The offer itself calls for an acceptance "in writing or by telegraphic notification delivered within five days from the date of this letter, in accordance with Paragraph 13. . . ."

The offer was dated November 9th. Accordingly, the 14th was the fifth day, and it was a Saturday. The acceptance was dated the 13th.

Appellant testified that he telephoned his acceptance to respondent on the 13th, and was told that he must put it in writing. The offer called for either written or telegraphic notification, so the telephonic "acceptance" has to be disregarded. However, if appellant's letter dated the 13th was mailed even as late as the 14th—the fifth day—it was within time, although not *received* in San Francisco until Monday, the 16th. Neither paragraph 13 nor the offer itself specifies that the acceptance must be *received* within five days; they call for an acceptance *delivered* within five days.

It is elementary that a contract is complete when the letter of acceptance is posted. (Civ. Code, § 1583; *Ivey* v. *Kern County Land Co.*, 115 Cal. 196, 201 [46 P. 926]; *Bank of Yolo* v. *Sperry Flour Co.*, 141 Cal. 314, 315 [74 P. 855, 65 L.R.A. 90].) The word "delivered" in the offer creates only an apparent, not a real difficulty, because under the law dealing with the formation of contract, *delivery of an acceptance to the post office operates as delivery to the person addressed*, except in unusual cases.

Section 1583, Civil Code, *supra,* provides that "Consent is deemed to be fully communicated between the parties as soon as the party accepting a proposal has put his acceptance in the course of transmission to the proposer, in conformity to the last section."

There are many cases holding substantially that the deposit by one party in the mails of an instrument properly addressed to the other party, with postage thereon prepaid, constitutes a *delivery* to the other party, *at the* place where and the *time when it is so deposited.* (See *Navajo County Bank* v. *Dolson,* 163 Cal. 485, 490 [126 P. 153, 41 L.R.A.N.S. 787] ; *Kraemer* v. *Coward,* 2 Cal.App.2d 506, 509 [38 P. 2d 458] ; *Loud* v. *Collins,* 12 Cal.App. 786, 789, 790 [108 P. 880] ; see, also, 1 Williston on Contracts (rev. ed.) § 86.)

The post office was clearly the agent of the offeror, for the offer was itself sent by mail and it called for an acceptance in writing and thereby invited the use of the same medium as that chosen for the offer.

It is claimed by respondent and conceded by appellant that the acceptance of the 13th was not opened in the respondent's San Francisco office until Monday, November 16th. Appellant argues, however, that it might well have been mailed on the 13th, in which case it might have been received on the 14th had respondent's office been open for business on that day, which was a Saturday. The case is susceptible of that inference, as there is no testimony as to whether the office was open or closed. Let it be conceded, however, that it was received on Monday, the 16th. If from that fact the inference could be drawn that it had been mailed in Fresno county on Saturday, the 14th—the fifth day—then a directed verdict, if based on the acceptance being too late, could not be sustained.

In addition to an acceptance within five days, the offer called for the signing of four copies of a formal contract. These were never sent to appellant *for signing* for reasons already appearing. At the argument on appeal it was conceded that one copy of this proposed formal contract accompanied the offer. Hence its terms had been disclosed to appellant before he accepted. Under the holding in *Gavina* v. *Smith,* 25 Cal.2d 501, 503, 504 [154 P.2d 681], this sufficed for the formation of a contract, and the rule announced in 6 California Jurisprudence, page 58, section 33, has no application.

It might be noted, before leaving this phase of the case, that respondent did not base its refusal to go forward on the grounds now relied on to support the court's ruling, namely, (a) that the acceptance was not delivered within the five days, or (b) that the formal contract was never signed by appellant. In its letter of December 2d, respondent assigned a totally different reason, namely, that appellant's letter of the 13th ''was superseded on the 14th'' by the assignment telegram, and added, ''We, therefore, agreed to sell this brandy to Mr. Williar and are unable to do otherwise at this late date.'' From this it appears that respondent considered that an assignable contract had been entered into. Appellant argues, moreover, that the very fact that respondent recognized Williar as the assignee of appellant and proceeded to do business with him as such, was a tacit admission that the contract had been entered into.

This brings us to the telegram which caused the trouble. No reason appears to us, and none is suggested by counsel, why appellant was in any way obligated to notify respondent that he had given an option to anybody. Certainly, until the option was exercised it would be no concern of respondent. But the telegram went much further and purported to be itself an assignment of all appellant's rights in the ''offering of commercial brandy'' then pending. Appellant vigorously denies authorizing any such message. He admits giving Miss McKeighan authority to notify respondent that he had given the option, but that is as far as he goes. He claims he did not authorize the signing of his name to a telegram or to any other message. At the next trial the defense may be able to show that appellant did authorize the telegram in the form in which it was sent, but on this appeal from a judgment entered on a directed verdict this court cannot say that such assignment was made, in the face of appellant's positive testimony, which at this stage is uncontradicted, and which amounts to a claim that such authority as he gave over the telephone was exceeded.

Appellant contends that the court erred in holding that loss of profits could not be proved under a general allegation of damages.

Damages were pleaded in this case in general terms only, the allegation being that as a result of the association's refusal to deliver the brandy plaintiff had sustained damage in sum of $35,853.

The complaint alleged that plaintiff was unable to purchase the quantity of brandy similar to that covered by the agreement, and appellant testified that he tried to buy brandy after the refusal to deliver, but there was none on the market.

Appellant's counsel stated: ''Then we have to prove this: That he . . . had made all preparations to bottle this brandy under the regulations then existing, which permitted him to make even a larger profit than he would have made if he had bought and sold the brandy. He had made all the plans for taking care of this brandy and selling it by the case, and we have the figures to show just what the profit would be.'' The court replied, ''. . . you haven't alleged any such damages—loss of profits,'' and added ''general damages do not include, in a case of this kind, loss of profits; they have to be properly pleaded; . . . It is a matter you haven't pleaded, and I am not going to permit the proof.''

The following offer of proof was then made:

''Mr. Lynch: I wish to make a complete offer . . . to show what our damage is, and then if your Honor rules that we can't introduce any evidence, why, we will have the record.

''I offer to prove . . . that at the time that the defendant broke the contract, as we allege, and failed to deliver the brandy at the price indicated, that there was no possibility of obtaining any brandy in the market; that the brandy supply had been exhausted.

''I offer to prove that this plaintiff had made arrangements with another concern to use that brandy in bottling —to use it for bottling purposes and to sell it in case lots in the general market for which there was a very large demand at that time, and that the profit from that venture would have been approximately $11.38 a case; and that the total profit to Mr. Morello under this arrangement would have been one-half of that, and that he would have been entitled to a profit of some $2.76 . . . per proof gallon.

''We also want to prove that there was a very good market for case goods, for brandy bottled in that way, and that many of the distillers were thus disposing of their brandy— that they wouldn't sell it—that they were using it for the purpose of converting it into case goods and placing it on the market for sale.

''Mr. Conley: To which we object on the ground it would be incompetent, irrelevant and immaterial, no proper proof of damage, not responsive to any properly pleaded issue.

''The Court: I will sustain the objection.''

Appellant testified that other brandy was unobtainable on the market, and by his tender he assured the court that he was prepared to prove that he had made arrangements for the ultimate sale of the association's brandy at a profit. This brought the case within the rule announced in *McKay* v. *Riley*, 65 Cal. 623 [4 P. 667], and recently ℸeaffirmed in *Grupe* v. *Glick*, 26 Cal.2d 680, 688 [150 P.2d 532], (a breach of warranty case). In the latter case it is said: "... whether the loss of profits is allowed as a separate item of damages, or indirectly as a part of the general damages, the recovery of them has generally been limited to cases where the goods are unobtainable on the market (*National etc. Mfg. Co.* v. *Producers' Refining Co.*, 169 Cal. 740 [147 P. 963]; *McKay* v. *Riley*, 65 Cal. 623 [4 P. 667]; *Coates* v. *Lake View Oil & Refining Co.*, 20 Cal.App.2d 113 [66 P.2d 463]; *Long Beach Fisheries Co.* v. *Curtis Corp.*, 58 Cal.App. 318 [208 P. 372]; note, 52 L.R.A. 209; note, 53 L.R.A. 33; anno. 88 A.L.R. 1439; 46 Am.Jur.Sales, p. 817, sec. 689), and, consequently, the buyer cannot offer his vendee a reasonable substitute to fulfill his resale contract." See, also, *Roach Bros. & Co.* v. *Lactein Food Co.*, 57 Cal.App. 379, 390 [207 P. 419].

Section 3300, Civil Code, provides that "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom," and section 1787 provides that: "(2) The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract."

This action was brought on a contract claimed to have been entered into in November, 1942, but that contract cannot be divorced from the underlying contract of October 4, 1938, for, as we have seen, the earlier one provided that the appellant should have first call on as many gallons as he had processed, at the price offered to the association by outsiders. That provision, obviously, was put into the contract as an inducement to the distillers to join in the enterprise. What, then, was in the contemplation of the parties when these contracts were being negotiated? The whole project was designed to produce brandy to sell. It produced, in fact, 4,000,000 gallons. The object and purpose of an out-

sider in buying brandy from the association would certainly be for resale, whether in bulk or bottled, at a profit. The processors, however, had a preferential right to buy, and it is inconceivable that any different object or purpose could have been in contemplation in their case. In *Grupe* v. *Glick, supra,* 26 Cal.2d 680 at 689, it is said, ". . . it is unrealistic to say that the seller, knowing the purpose for which the buyer is purchasing, cannot foresee the damages that will follow from a breach of warranty not ascertainable until the goods are put to use by the buyer's vendee."

The loss of such profit on resale, if proved, would seem to be a "loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract." (Civ. Code, § 1787(2); Civ. Code, § 3300.) If so, then under the authorities it could be proved as general damages without being specially pleaded.

In the leading case of *Tahoe Ice Co.* v. *Union Ice Co.,* 109 Cal. 242, 249 [41 P. 1020], it was claimed that as to the profit for a certain year the complaint was insufficient, "and that evidence was erroneously admitted on that subject, because such profit was in the nature of special damages which were not specially pleaded." The court said, "This contention cannot be maintained. Loss of profits which, like those claimed in the case at bar, are the direct and natural results of a contract, and which the law implies from such breach are recoverable without special allegations [citations]." Other cases so holding are *McConnell* v. *Corona City Water Co.,* 149 Cal. 60, 66 [85 P. 929, 8 L.R.A.N.S. 1171]; *Germain Fruit Co.* v. *J. K. Armsby Co.,* 153 Cal. 585, 590 [96 P. 319] (breach of warranty); *Ahlers* v. *Smiley,* 163 Cal. 200, 205 [124 P. 827]; *Robinson* v. *Rispin,* 33 Cal.App. 536 539 [165 P. 979], and *Brunvold* v. *Johnson,* 36 Cal.App.2d 226, 230 [97 P.2d 489]. See, also, *Shoemaker* v. *Acker,* 116 Cal. 239, 245 [48 P. 62]. No case to the contrary is cited by respondent.

In *Grupe* v. *Glick, supra,* at page 688, it is said, "The amount lost by Grupe on account of these prospective profits was therefore properly included in the sum allowed as general damages for breach of warranty if the evidence shows that such damages are (1) such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, and (2) reasonably certain."

In *Bercut* v. *Park, Benziger & Co.,* 150 F.2d 731, 733, an instruction was refused which embodied the theory that

prospective profits constituted special damages. In the course of its opinion affirming the judgment the Circuit Court of Appeals (9th) said: "In these California decisions the buyer's loss of profits appears to be regarded as the direct and natural consequence following in the ordinary course of events from the seller's failure to deliver," citing *Orester* v. *Dayton Rubber Mfg. Co.*, 228 N.Y. 134 [126 N.E. 510] as expressly holding that such damages as loss of profits are not special, but are general damages.

*Shoemaker* v. *Acker, supra,* at pages 244-5, points out the difference between ordinary loss of profits and other losses which are consequences of the breach of contract but "are wholly collateral to the one broken, do not directly flow from it, and are not stipulated for or contemplated by the parties to the contract sued on." Such latter losses, under the authorities, must be specially pleaded. The present, however, is not such a case, and we are satisfied that the court erred in ruling against the appellant on his tender of proof.

Respondent claims that appellant's "offer of proof scarcely meets the requirement as to detail and specific character required by the authorities." After appellant's counsel had stated what he knew he had to prove, the judge definitely indicated that he was "not going to permit the proof" of loss of profits because it had not been specially pleaded. After that it would seem that appellant need not have gone further in order to save the point for review on appeal (*Caminetti* v. *Pacific Mutual etc. Co.*, 23 Cal.2d 94, 100 [142 P.2d 741]; *Tomaier* v. *Tomaier*, 23 Cal.2d 754, 760 [146 P.2d 905]; *Lawless* v. *Calaway*, 24 Cal.2d 81, 91 [147 P.2d 604]; *Heimann* v. *City of Los Angeles*, 30 Cal.2d 746, 757 [185 P.2d 597].) Nevertheless, he made a more detailed tender, already quoted, which in our opinion was sufficient.

Respondent makes the further point that, assuming the sufficiency of the tender, loss of profits would have been inadmissible (and hence there was no error) because such proof if admitted would have made out a case of a new business venture where such loss cannot be proved. (25 C.J.S. p. 518; 8 Cal.Jur. p. 777; *California Press Mfg. Co.* v. *Stafford Packing Co.*, 192 Cal. 479 [221 P. 345, 32 A.L.R. 114]; *Gibson* v. *Hercules Mfg. Co.*, 80 Cal.App. 689 [252 P. 780]; *Lacy Mfg. Co.* v. *Gold Crown Mining Co.*, 52 Cal.App.2d 568, 574 [126 P.2d 644].) This, in short, is an attempt to support the court's ruling, not on the ground on which it was based (which was

that appellant could not prove loss of profits because he had not specially pleaded it) but on a newly-discovered ground not brought to the trial court's attention, and which, therefore, could not have influenced or motivated the direction of the verdict (see *Standard Livestock Co.* v. *Pentz,* 204 Cal. 618, 630 [269 P. 645, 62 A.L.R. 1239]). Wholly aside from that consideration, it cannot be said on this record what the appellant's proof would have shown, for he was not permitted to produce it. Because of the rulings he was foreclosed from showing what "arrangements" had been made "with another concern to use that brandy in bottling" and "sell it in case lots" (quoting the tender). Hence we are in no position to say whether or not the proof would have brought the case within the rule invoked.

We are satisfied there is sufficient evidence from which it may be inferred that the acceptance was within time. We are satisfied, also, that the court erred in rejecting the proof of loss of profits. Our conclusion on the latter question renders it unnecessary to discuss whether the amendment should have been allowed.

The judgment is reversed.

Nourse, P. J., and Dooling, J., concurred.