[Civ. No. 17730. Second Dist., Div. Three. Apr. 16, 1951.]

HELEN WALPOLE, Plaintiff and Appellant, v. PREFAB MANUFACTURING COMPANY et al., Defendants and Appellants.

478

Wood, Crump, Rogers & Arndt and Stanley M. Arndt for Plaintiff and Appellant.

O'Melveny & Myers, Lauren M. Wright and John P. Pollock for Defendants and Appellants.

VALLÉE, J.—Appeals from a judgment for plaintiff in an action for damages for breach of a contract to sell and deliver prefabricated houses.

In September, 1945, plaintiff and defendant Prefab Manufacturing Company (referred to as Prefab), a copartnership, entered into an oral agreement whereby Prefab appointed plaintiff sales agent and distributor for the sale of prefabricated houses manufactured by Prefab. The latter agreed to sell to plaintiff as many prefabricated houses as she would

order at such dealers' list prices as, from time to time, would be published by Prefab. It was understood that plaintiff was to resell the houses. She was to pay cash for them; or if the purchaser desired to buy on credit, Prefab would fill the order only if the credit of such purchaser was approved by Allied Building Credits, Inc. Either party had the right to sell the prefabricated houses at any place and in competition with the other. The agreement was terminable by either party at will.

From time to time Prefab issued price lists showing the price to be paid by plaintiff and the price that plaintiff was to charge her customers. The difference between the two prices was 25 per cent of the cost to plaintiff. The 25 per cent was 20 per cent of plaintiff's selling price.

On January 25, 1946, the parties orally agreed that Prefab would sell and deliver to plaintiff, at Prefab's dealers' existing list price, prefabricated houses on all bona fide orders which had been received by plaintiff or her subdealers prior to midnight on January 25, 1946, provided a list of such orders had been submitted by plaintiff to Prefab prior to midnight of January 31, 1946, and that each such order had been paid for in cash or was in actual process of financing with Allied Building Credits, Inc., on or before February 9, 1946, and would thereafter be approved by Allied.

On January 30, 1946, plaintiff submitted to Prefab a list in writing of 103 orders for 121 houses. On February 1, 1946, Prefab notified plaintiff that it would fill orders for only 25 houses.

Of the 103 orders submitted by plaintiff, the court found that 34 were bona fide orders which had not been filled as promised by Prefab and that the remainder were not bona fide. The 34 orders would have been sold to plaintiff for $50,215.39 and plaintiff would have resold them for $62,737.72, a difference of $12,522.33.

The complaint was in six counts. Counts 3 and 6 were dismissed by plaintiff. The remainder alleged (1) damages for failure of Prefab to fill accepted orders; (2) damages for sales made by Prefab in territory alleged to be exclusive to plaintiff; (4) commisisons on an order received by Prefab directly and alleged to have been turned over to plaintiff; (5) damages on certain orders alleged to have been taken by plaintiff and cancelled because the houses did not pass building law requirements.

The court found that plaintiff had been damaged in the sum of $12,522.33, the amount she would have received on resale had Prefab filled the 34 bona fide orders. It found for defendants as to counts 2, 4, and 5. Judgment was for plaintiff against Prefab and its copartners for $12,522.33, with interest from February 1, 1946. All parties appeal.

## Appeal of Defendants

Defendants' assignments of error are: (1) The court erred in awarding plaintiff the difference between the price she would have paid Prefab had the orders been filled and the price she would have received on resale. (2) The court erred in awarding interest on the damages adjudged.

The measure of damages for failing to deliver goods is prescribed by Civil Code section 1787, enacted in 1931, which reads: "(1) Where the property in the goods has not passed to the buyer, and the seller wrongfully neglects or refuses to deliver the goods, the buyer may maintain an action against the seller for damages for nondelivery. (2) The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract. (3) Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver." Section 1787 is section 67 of the Uniform Sales Act. It comes from section 51 of the English Sale of Goods Act, with the insertion at the beginning of subsection (1) of the words: "the property in the goods has not passed to the buyer, and . . ."

The court did not make a specific finding that there was not an available market for prefabricated houses of the kind and quality manufactured by Prefab; however, there is evidence to that effect. The only inference that can be drawn from the uncontradicted evidence is that there was no available market. The complaint alleged that plaintiff "could only get such units from defendant Prefab." The prefabricated houses were specially built and designed, were made of a variety of materials cut into varying sizes which, when assembled, became the prefabricated units offered for sale. In the nature of things, they were a commodity not usually found on the market. *(Cf. Patty v. Berryman, 95*

Cal.App.2d 159, 172 [212 P.2d 937].) It is apparent that plaintiff could not replace the prefabricated units and thus satisfy her own vendees who were entitled to insist upon receiving the specific prefabricated units they had ordered and not reasonable substitutes therefor. The case was tried by all parties upon the theory that there was not an available market for the houses. The trial judge in his memorandum opinion stated they were such that they could not "be procured in the market." Having proceeded on this theory at the trial, Prefab cannot now complain of error. (*Wolfsen* v. *Hathaway*, 32 Cal.2d 632, 646-47 [198 P.2d 1]; *Kantlehner* v. *Bisceglia*, 102 Cal.App.2d 1, 6 [226 P.2d 636].)

█ Further, where the trial court has not made a finding on an issue, the reviewing court will not assume that it would have made a finding contrary to the uncontroverted evidence and the reasonable inferences therefrom. On the contrary, the reviewing court will assume that had the finding been made it would have been in accord with such evidence. (*Sun-Maid Raisin Growers* v. *Papazian*, 74 Cal.App. 231, 238 [240 P. 47].) █ It is evident from the facts found and the judgment ordered, in the light of the entire record, that if the court had found on the question of whether there was an available market, the finding would have been adverse to Prefab. Prefab cannot complain of the lack of such specific finding. (*Chamberlain* v. *Abeles*, 88 Cal.App.2d 291, 300 [198 P.2d 927]; see *Boas* v. *Bank of America*, 51 Cal.App.2d 592, 598 [125 P.2d 620].)

█ In the absence of an available market, the measure of damages "is the loss directly and naturally resulting in the ordinary course of events" from Prefab's breach. (Civ. Code, § 1787(2).) █ On breach of a contract, loss of profits shown to be the direct and natural result of the act or omission complained of may be recovered provided the amount thereof is shown with sufficient certainty. (*McKay* v. *Riley*, 65 Cal. 623 [4 P. 667]; *National etc. Mfg. Co.* v. *Producers R. Co.*, 169 Cal. 740, 745 [147 P. 963]; *Morello* v. *Growers Grape Prod. Assn.*, 82 Cal.App.2d 365, 374-376 [186 P.2d 463]; *Panno* v. *Russo*, 82 Cal.App.2d 408, 415 [186 P.2d 452]; *Norwood Lumber Corp.* v. *McKean* (3 Cir.), 153 F.2d 753, 757; 5 Williston, Contracts (rev. ed.) § 1347; 25 C.J.S. 516, § 42, 46 Am.Jur. 817, § 689.) █ Where profits are expressly stipulated for in the contract, as they were in the case at bar, and are the real purpose and direct and immediate fruit of

the contract, they are part and parcel of it and must be considered as entering into and constituting a portion of its very elements. (*Schiffman* v. *Peerless Motor Car. Co.*, 13 Cal. App. 600, 604 [110 P. 460].)

Expenses incurred in anticipation of, or preparation for, performance, ordinarily are a recoverable element of damage for breach of contract. (*Buxbom* v. *Smith*, 23 Cal.2d 535, 541 [145 P.2d 305]; 25 C.J.S. 524, § 46.) In the present case, such expenses are included in the difference which plaintiff would have been required to pay Prefab for the houses and the resale price.

Under the agreement, plaintiff was a mere middleman whose profit was dependent upon the difference between purchase and selling price. The profits to be derived from plaintiff's resales were specifically made a part of the agreement between the parties. It was understood and expressly agreed that her margin of profit upon such resales was to be a stipulated percentage over and above the price she was to pay Prefab. The parties fixed the measure of damages in the event of a breach. The loss of these profits resulted directly and naturally in the ordinary course of events from Prefab's breach of the agreement.

*Long Beach F. Co.* v. *Curtis Corp.*, 58 Cal.App. 318 [208 P. 372], and *Roach Bros. & Co.* v. *Lactein Food Co.*, 57 Cal. App. 379 [207 P. 419], relied on by Prefab, are not in point. In the Long Beach case the only pertinent point decided was that testimony of a witness to the effect that there was no market for fish could not be considered because a foundation had not been laid by proof that he was an expert. In the Roach case there was no evidence, as there was here, that there was not an available market. Both cases were decided before the enactment of Civil Code, section 1787. Each case discussed then Civil Code, section 3308, which at that time (1922) fixed the measure of damages for the breach of a seller's agreement to deliver personal property. The measure fixed by section 1787 is not the same as that formerly fixed by section 3308. Section 3308 was repealed in 1931 (Stats. 1931, p. 2258.)

Prefab says the court awarded gross profits instead of net profits. If plaintiff's fixed expenses neither increased nor decreased as a consequence of Prefab's nonperformance, there was no loss or benefit arising from that factor. (*Oakland Cal. Towel Co.* v. *Sivils*, 52 Cal.App.2d 517, 520 [126 P.2d 651].) Whether the fixed expenses set forth in plaintiff's monthly

operating statements, in evidence, were or were not affected as a consequence of the nonperformance of the contract was a question for the trial court. Prefab does not point out wherein the court erred in impliedly finding that the expenses were not so affected. ██ There was evidence that no expenditures were required of plaintiff to consummate her resale contracts. Plaintiff's vendees, in addition to paying the selling price, were required to pay all other expenses, such as haulage, sales tax, cost of blueprints, credit investigation reports and interest. Hence plaintiff's gross profits were her net profits and were properly allowed.

██ Prefab claims that commissions (8 per cent of the 20 per cent retail sales price) which plaintiff had agreed to pay her subdealers, should be deducted from the total profit plaintiff lost because, it is argued, under the terms of the contracts between plaintiff and her subdealers, the latter have no claim against plaintiff for these commissions. The contention is not tenable. The contracts between plaintiff and her subdealers provided that the commission of the subdealers "shall be payable in cash semi-monthly upon delivery of accepted orders and payment has been received in full by the company," and that "the delivery of materials by the Company is subject to the availability of the materials to the Company." Prefab does not deny that had the contracts been performed plaintiff would have been liable for the commissions. If, therefore, she is entitled to recover the 20 per cent loss of profits on all bona fide sales, as we hold she is, she cannot deny liability under her contracts with the subdealers who effected any of the bona fide sales. The provisions of the contracts between plaintiff and her subdealers do not release plaintiff from her obligation to the subdealers under the facts. The sales were not made to the subdealers. As we construe these provisions of the contracts, *payment* to subdealers was to be made upon delivery of the houses and receipt of payment by plaintiff. The award to plaintiff of the difference between the contract and resale price is the equivalent of delivery and payment. The compensation of the subdealers was a commission upon a purchase which they had induced third persons to make. Further, Prefab, at the trial, expressly abandoned the defense of impossibility of performing the contract through inability to secure materials. As said by the learned trial judge in his opinion, "If the plaintiff is entitled to recover against the defendant upon an order

secured by one of her subdealers, she certainly is not entitled to say to the subdealer that he is not just as much entitled to his percentage of the recovery as he would have been to his percentage of the sales price had the goods been delivered. Plaintiff would not be entitled to take advantage of the subdealer's efforts and secure a judgment of damages because of them, and yet say to him that his efforts could not be compensated because the order had not been fulfilled. Having taken advantage of his efforts and treated the contract as a binding contract for the purpose of securing a judgment against the defendant, she must treat it as binding upon her.''

█ Even though the original buyer has not yet been held liable to his subvendee, the amount of his probable liability may be recovered from the original seller. (3 Williston, Sales (rev. ed.) §§ 599a, 614a.) The court properly awarded plaintiff the full 20 per cent profit she lost by reason of Prefab's breach.

█ Interest was awarded plaintiff from February 1, 1946, the day of the breach. Prefab's claim of error is without merit. Interest is allowable from the time the sum becomes due if, as here, it is certain or can be made certain by calculation. (Civ. Code, § 3287; *Lineman* v. *Schmid*, 32 Cal.2d 204, 209 et seq. [195 P.2d 408, 4 A.L.R.2d 1380].)

### Appeal of Plaintiff

Plaintiff's assignments of error are: (1) The court erred in not awarding additional damages by reason of Prefab's breach of the agreement of January 25, 1946. (2) The findings with respect to counts 2, 4, and 5 are not supported by the evidence. (3) The court erred in sustaining Prefab's objection to the reception of evidence with respect to special damages.

1. Plaintiff included in the list submitted January 30, 1946, 13 orders which the court found were not bona fide. Plaintiff claims this finding is not supported by the evidence. The findings do not define the term ''bona fide'' as used therein. We assume from the record that the court meant that an order was not ''bona fide'' if it was based on a contract which was not valid or was not subsisting at midnight on January 31, 1946, or if it was not on the list submitted. The findings do not specify wherein these 13 orders were not bona fide. They were not filled. Under the agreement of January 25, 1946, the only orders which Prefab agreed to fill were bona fide orders which had been taken by plaintiff or her subdealers prior to January 25, 1946, and which were

submitted to Prefab on a list prior to midnight of January 31, 1946, and which were either paid for in cash or in actual process of financing with Allied Building Credits, Inc., on or before February 9, 1946, and were thereafter approved by Allied.

The court found with respect to the orders which it found to be bona fide that "plaintiff was excused from tendering the purchase price in cash or from seeking to have the credit of the purchasers approved by Allied Building Credits, Inc.," because "it would have been useless for the plaintiff to have tendered payment in cash upon said orders or to have sought to have the credit of the purchasers named in said orders approved by Allied."

Plaintiff asserts that Prefab stipulated that all orders taken by plaintiff prior to January 25, 1946, and submitted on the list of January 30, 1946, were bona fide orders. The trial court did not, and neither do we, so construe the stipulation. Prefab merely stipulated that a large number of contracts and other documents could be received in evidence without proof of the signatures thereon, that certain checks were received by the payees, and that the contracts were taken on or prior to the dates they bear. Prefab's counsel expressly stated, "I will not stipulate that they are bona fide orders."

(a) Five orders (Medlock, Marrirro, Wilson, Woolsie, and Grimes) were not on the list submitted by plaintiff on January 30, 1946, and Prefab was therefore under no obligation to fill them under the agreement of January 25th.

(b) The contract on one order (Ackerman) was dated January 11, 1946. It expressly provided that the purchase was contingent upon the approval of the credit application. One hundred dollars was paid on signing the contract. Nothing further was done prior to January 31st. An application for credit had not been made at that time. On March 29, 1946, the customer requested that the contract be cancelled. It was cancelled and the deposit returned. The evidence was thus sufficient to warrant the court in concluding that the Ackerman order was not bona fide.

(c) On January 7, 1946, plaintiff received two orders (Nichols) which were on the January 30th list. One was for two houses, sales price $4,004.02; the other was for six houses, sales price $4,651.28. Two hundred and fifty dollars was deposited with each order. Credit applications on these orders were approved by Allied on February 7, 1946. Only two of the houses—in the order for six houses—were de-

486

livered. We are unable to find any basis for the finding that these orders were not bona fide. The evidence with respect to them is not controverted. The order of $4,651.28 was filled to the amount of $1,550.43, leaving unfilled four orders of $3,100.85 and two orders of $4,004.02, a total of $7,104.87. Plaintiff is entitled to judgment for 20 per cent thereof, or $1,420.97, with interest thereon from February 1, 1946.

(d) On December 8, 1945, plaintiff received an order for one house from Summer. It was on the list of January 30th. The order was cancelled on January 30, 1946, and a new order taken. The required deposit on the latter order was $200. Only $95.50 was deposited with the first order. No further deposit was made. Summer did not, on January 30, 1946, own the property on which the house was to be erected. Plaintiff refunded to Summer on February 15, 1946, and was released of all claims. The evidence was thus sufficient to warrant the court in concluding that this order was not bona fide.

(e) On December 11, 1945, plaintiff received an order for one house from Hilton, delivery to be made to Bray, c.o.d., on ''JAN. 10 OR SOONER.'' A deposit of $150 was received with the order. There was no evidence that delivery was tendered on January 10th or sooner. There is no evidence as to why delivery had not been made prior to that date. Plaintiff refunded the $150 on March 8, 1946. The court was warranted in inferring that the contract was abandoned.

(f) On December 16, 1945, plaintiff received an order for one house from Carrigan. A deposit of $25 on a purchase price of $1,915.50 was received. The contract contained this provision: ''Refundable if no deal.'' No additional cash was paid and no application for credit was made prior to February 1, 1946. Plaintiff made no showing as to why nothing was done between December 16th and February 1st. The $25 was refunded on April 29, 1946. The evidence thus supports the finding that this order was not bona fide.

(g) On January 12, 1946, plaintiff received an order for one house from Garnett. A cash payment of $100 was received on January 14th and refunded on February 23, 1946. No further payment was made and no application for credit made prior to February 1, 1946. Plaintiff made no showing as to why one or the other had not been done. The court was warranted in concluding that this order was not bona fide.

(h) On January 24, 1946, one Shook was to be one of plaintiff's subdealers. On that date he gave plaintiff a

check for $1,278.42 on a purchase price of $1,389.88 for a house to be delivered on January 28th at Needles. The house was to be used by Shook as a model. The order was on the list of January 30th. Plaintiff returned Shook's check to him. The date it was returned does not appear. The court was warranted in inferring that this contract was contingent on Shook's becoming a subdealer and that, because of the agreement between plaintiff and Prefab of January 25, 1946, the sale was mutually cancelled.

(i) Plaintiff received $65.50 from Thompson. An application for credit was made to Allied which was approved on February 1, 1946. The order appears in the list submitted by plaintiff on January 30th as follows:

"Date P.O.# Unit Customer Sales Deposit Status
"12-22-45 1065 1 Thompson 80.50 ABC Rejection
 (Con. Lost)"

This is all of the evidence with respect to this order. In view of the fact that it appears from the list that the order had been cancelled, the court was warranted in so concluding even though Allied approved credit on February 1.

2a. On December 17, 1945, Prefab sold directly to West End Chemical Company eight prefabricated houses for $17,104. It paid a commission of $1,425.32 thereon to Angelo and Woolsen. It did not pay a commission to plaintiff. The court found that plaintiff was not entitled to any commission thereon. Plaintiff claims the finding is unsupported by the evidence. When the order was received by Prefab it handed it to plaintiff. The houses ordered were delivered directly by Prefab to West End. Apparently payment was made by the latter through a distributor other than plaintiff. The sale was not made by plaintiff. Plaintiff did not fill the order or perform any service in connection with it. Prefab did not agree to pay plaintiff a commission on the sale. Plaintiff did not assume any obligation to either Prefab or West End. Prefab did not obligate itself to her in any way in connection with the order. She did not earn a commission on the sale. This finding is amply supported by the evidence.

2b. With respect to two orders (Landrum and Mohr) obtained by plaintiff, the court found that the officials of the cities of Manhattan and Burbank refused to issue permits for the erection of the houses, "and assigned as a reason therefor that the same did not comply with the 'Uniform Building Code,' which building code was in effect in said cities." The

court further found that the houses did comply with said code and "that the defendant did not warrant that any officials in charge of the interpretation of said code would not deny permits," and "the plaintiff lost two sales by reason of the action of such officials but that such sales were not lost because the buildings as constructed by the defendant did not comply with the building code." Plaintiff claims these findings are not supported by the evidence and that the court should have awarded her damages because of Prefab's failure to fill the orders. This claim is untenable. There was no evidence that these houses did not comply with the building code. There was evidence from which the court could infer that the refusal of the officials to issue permits was due to resistance in some communities to prefabricated houses.

2c. Prefab made sales through Dill and through Herman. The places of business of Dill and Herman were within 5 miles of a place of business of a subdealer established by plaintiff. The court found "that said sales were not in violation of any contract between plaintiff and defendant and that the defendant did not contract not to sell to other dealers within five miles of subdealers established by the plaintiff." Plaintiff concedes that she did not have an exclusive contract. She claims that on January 11, 1946, it was agreed between herself and Prefab "that no dealer would be permitted to put up a model house within 5 miles of the model house of another dealer." There was written evidence that the agreement was "that no more dealers would be set up out of town by you or myself without checking with each other first." Further, there was evidence from which the court could have inferred that the Dill and Herman distributorships were established prior to January 11, 1946. While there was evidence from which the court could have concluded that the parties made the agreement claimed by plaintiff and that the distributorships were established after January 11th, resolution of the conflict was for the trial court. It did not err in making this finding.

3. Plaintiff alleged as special damages that by reason of the breach by Prefab of the agreement of January 25, 1946, "her business, name, character and reputation were unjustly assailed and her good will was injured and impaired to her damage in the sum of $25,000," and in addition that "as a result of said actions of said defendant Prefab, it was necessary for plaintiff to employ additional clerical force to handle the various complaints of her subdealers and of the persons who had

placed such orders and made such deposits and to endeavor to placate them and make refunds and as a result, plaintiff spent at least $4,797.81 more than plaintiff otherwise would have spent had defendant Prefab delivered the California Cottages in accordance with its agreement, to plaintiff's further damage in the sum of $4,797.81.'' Plaintiff sought to introduce evidence in an effort to prove these allegations. Prefab's objections thereto were sustained.

 Plaintiff was not entitled to damages for injury to her name, character, or personal reputation. Such damages are too uncertain, speculative, and remote. In *Westwater* v. *Grace Church*, 140 Cal. 339 [73 P. 1055], it was held that a plaintiff in an action for breach of contract cannot recover damages for injury to her reputation, the court saying, page 342: ''What the reputation was, what it is now, how much and in what way it has been impaired by defendant, or has it been impaired by other persons or other causes, or by failure of the powers and ability of plaintiff, leads us into questions too abstruse and complicated for the human mind. Certainly such damages are not clearly ascertainable.'' (See also *Mc-Gregor* v. *Wright*, 117 Cal.App. 186 [3 P.2d 624].)

 A different rule applies to damages for injury to her business and its good will and to expenditures made for additional clerical help. As we have said, plaintiff's measure of damages ''is the loss directly and naturally resulting in the ordinary course of events'' from Prefab's breach. (Civ. Code, § 1787(2).) The general rule is that damages from loss of good will and injury to business resulting from a breach of a contract to deliver goods are recoverable. (*Stott* v. *Johnston*, 36 Cal.2d 864 [229 P.2d 348]; *Elkus Co.* v. *Voeckel*, 27 Ariz. 332 [233 P. 57, 58]; *Barrett Co.* v. *Panther Rubber Mfg. Co.*, 1 Cir., 24 F.2d 329, 337; *Cramerton Mills* v. *Nathan & Cohen Co.*, 231 App.Div. 28 [246 N.Y.S. 259, 267].) While in the Stott, Barrett and Cramerton cases a breach of warranty was alleged, the measure of damages is the same as in a case of failure to deliver goods. (Civ. Code, § 1789(6).)

 It is also the general rule that a person is entitled to recover all reasonable and necessary expenses to which he may have been put by reason of a breach of contract. (*McCulloch* v. *Liguori*, 88 Cal.App.2d 366, 375 [199 P.2d 25]; *Blair* v. *Brownstone Oil & Refining Co.*, 35 Cal.App. 394-396 [170 P. 160]; *Hockersmith* v. *Hanley*, 29 Ore. 27 [44 P. 497, 501]; *Blumenthal* v. *Stahle*, 98 Iowa 722 [68 N.W. 447, 448]; *Gild-*

*ner Bros* v. *Ford Hopkins Co.*, 235 Iowa 191 [16 N.W.2d 229, 233]; *Neil* v. *Cunningham Store Co.*, 149 Mo.App. 53 [130 S.W. 503, 506]; Rest., Contracts, §§ 334, 336 (e) (14); 25 C.J.S. 524, §§ 45, 46; 15 Am.Jur. 542, § 133.) If special damages are the natural consequences of the breach, they may be recovered. (3 Williston, Sales (rev. ed.) §§ 599a, 614 et seq.)

 The facts with respect to the claimed damages to plaintiff's business and its good will were alleged with particularity, and were sufficient, we think, to show that the injury thereto "directly and naturally" resulted "in the ordinary course of events" from the breach of the contract. (Civ. Code, § 1787.)

 We conclude that the court erred in sustaining objections to plaintiff's proffered evidence in her endeavor to prove damages to her business and its good will and expenditures for additional clerical help.

We are not to be understood as holding that the special damages alleged were a loss directly and naturally resulting in the ordinary course of events from Prefab's breach; that will be a question of fact for the trial court. We merely hold that the allegations of the complaint are sufficient to require the reception of evidence on the subject, and that if it is found that such damages were a loss directly and naturally resulting in the ordinary course of events from Prefab's breach, they are recoverable.

The judgment, insofar as it awards plaintiff general damages in the sum of $12,522.33, with interest thereon from February 1, 1946, is affirmed. The court is directed to add $1,420.97, with interest from February 1, 1946, to the amount of general damages heretofore awarded to plaintiff. In all other respects the judgment is reversed, and the cause is remanded for a new trial solely upon the issue of the amount of special damages, if any, sustained by plaintiff. Plaintiff shall bear one-half of the costs on appeal; defendants shall bear the other one-half.

Shinn, P. J., and Wood (Parker), J., concurred.

Plaintiff and appellant's petition for a rehearing was denied April 30, 1951. Defendants and appellants' petition for a rehearing was denied May 4, 1951, and defendants and appellants' petition for a hearing by the Supreme Court was denied June 14, 1951.