[Civ. No. 21284. Second Dist., Div. One. Apr. 23, 1956.]

LOUIS MANN et al., Respondents, v. EARL A. JACKSON et al., Appellants.

A. J. O'Connor and George J. Hider for Appellants.

Felix H. McGinnis for Respondents.

FOURT, J.—Plaintiffs, hereafter referred to as respondents, brought an action to recover damages from the defendants, hereafter referred to as appellants, for the breach of a written contract to build a certain wire assembling machine. Appellants answered by generally denying the material allegations of the complaint and pleaded four affirmative defenses. The substance of the affirmative defenses were: (1) that the appellants designed, built and delivered to the respondents a machine in accordance with the written contract, but that the parties modified the contract to provide that the respondents were to construct a certain rack on the machine in question, at their own expense and that the failure of the machine to operate properly was due to the respondents' failure to properly design and install the rack; (2) that the respondents, against the advice and without the consent of the appellants, attempted to change the design and installation of certain "take up" reels on the machine and did so improperly; (3) that the parties entered into an oral agreement wherein the appellants were to make certain alterations and additions to the machine, all at the request of the respondents for an agreed added price of $2,500, and that the alterations were made by the appellants; (4) that an agreement was made by the attorneys for the parties wherein it was agreed that all disputes were settled and terminated, excepting that there was to be an arbitration conducted on the amount of money to be paid to the appellants for later repairs to the machine.

Appellants also filed a cross-complaint for breach of the oral contract for alterations which they made to the machine at respondents' request, and for further damages for the added repairs. Respondents answered the cross-complaint, denying the material allegations thereof.

The case was tried by the court, without a jury. Judgment was in favor of the respondents for the sum of $17,749.17, plus costs. Defendants have appealed from the judgment.

By the terms of the written contract, which was dated December 6, 1951, the appellants, in substance, agreed to furnish to respondents within five months a wire machine to produce open line TV transmission wire, as per sample, at a minimum rate of 3,000 feet an hour, or more. The machine was to be complete in every detail, mechanically perfect and acceptable to the respondents. The appellants further guaranteed the effective operation of the machine for a six months' period. Respondents were to pay $10,000, for the machine, payable at the rate of substantially one-third of the total purchase price with the purchase order; one-third during the advanced stages of production, and the balance on delivery. The designs and drawings were to be the property of the respondents, and no other wire machine was to be made for anyone other than the respondents.

There was a sharp conflict in the statements of the witnesses. Taking the testimony most favorable to the respondents, a fair résumé of the evidence is as follows:

For a period of about two years before the contract was entered into, the respondents had been profitably engaged in the manufacture and sale of what was called open line TV wire. Shortly before the execution of the contract, the respondents informed the appellants of their requirements for a machine to produce open line TV wire to the end that their costs would be decreased and their volume increased. Appellants were advised of the nature of respondents' business and the intended ultimate use of the wire. After negotiations and discussions, the form of the contract was dictated and prepared. Apparently, each of the parties was present at the time of the dictating, writing and signing of the contract. The respondents agreed that one of their employees would make a certain rack on the machine for the appellants in accordance with the appellants' specifications. Such a rack was made as agreed.

The machine was delivered to the respondents on April 29, 1952. At that time the machine did not work satisfactorily.

It never produced salable wire. Appellants took repossession of the machine on July 4, 1952, to the end that it would be put in good working order. There was some discussion at or about that time with reference as to what should be done. The respondents directed a letter, dated July 14, 1952, to the appellants, to confirm the understanding arrived at between the parties. The substance of the letter was that the appellants were to repair the machine and get it in working order; the respondents were to pay an added $2,500, approximately three months after the machine was in good running shape, and to pay the balance due on the original contract, as soon as possible. There were set forth in the letter, in itemized form, several of the difficulties which the respondents had encountered with the machine.

Shortly before the 2d of September, 1952, the respondents brought an action against the appellants to regain possession of the machine, the respondents apparently contending that nothing had been done toward making it workable. While the machine was in the possession of the sheriff, the parties agreed that it should be returned to the appellants for a test run on September 2, 1952, subject to the understanding that appellants would relinquish possession to the respondents following such test. On or about September 2, 1952, the test run was made in appellants' shop. The machine failed to work. On the same day, the respondents paid the final installment of the written contract dated December 6, 1951.

Following the test run, the appellants refused to relinquish possession to the respondents. After some intemperate language between the parties, their attorneys orally agreed to attempt to provide for an arbitration of all claims of the parties. This proposed agreement to arbitrate was to be reduced to writing. Counsel for the appellants thereafter directed a letter to respondents' counsel, stating that it was intended that only the appellants' claims against the respondents would be arbitrated and that respondents were to release appellants of all liability. Respondents' counsel replied to the letter, denying any such understanding and thereupon the proposed arbitration was abandoned.

Shortly after the test run of September 2, 1952, the machine was redelivered to the respondents, who desired to see if it could be made to work. They engaged the services of an engineer who inspected it with the view of ascertaining if there was any possibility of making it operate satisfactorily. The machine was then delivered to the Lynn Manufacturing

Company for further investigation. It remained at the latter establishment until about December 17, 1952. Extensive work was done on the machine at the manufacturing plant above named; however, it became evident that even if it could be made to operate, its maximum capacity would be about 400 to 500 feet per hour.

The respondents expended $3,567.56, to others than the appellants, in payment of work and materials in an effort to repair or place the machine in working order. They paid the appellants $10,428.75.

In the period from May 1, 1952, the date the machine was to have been delivered to the respondents, to January 31, 1953, the respondents manufactured 1,875,535 feet of open line TV wire, by use of their existing manual method, at an actual cost of $21,536.80. Respondents could have produced that same quantity of wire during that same period of time with the automatic machine which the appellants agreed to furnish at a cost of $16,078.94. The difference between the actual cost to the respondents of the wire manufactured and sold, and the lessor cost of producing the same quantity of wire by means of an automatic machine was $5,457.86.

The trial court found that the parties had entered into the contract of December 6, 1951; that the respondents had paid appellants the sum of $10,428.75; that the machine was imperfect and incapable of performing as agreed; that the original contract of December 6, 1951, was not modified in any material respect; that from May 1, 1952, to December 31, 1952, the respondents expended $2,612.56, in a reasonable effort to cure the defects of the machine, but to no avail; that the reasonable value of the machine on September 2, 1952, and at the time of trial, was $750; that the respondents, from May 1, 1952, to January 31, 1953, manufactured manually and sold certain wire at a cost of $21,536.80; that said wire could have been manufactured with the automatic machine, if working, for the sum of $16,078.94.

Respondents were awarded judgment against the appellants for $9,678.75, being the difference between $10,428.75, the amount paid to appellants, minus $750, the value of the machine, plus $2,612.50, paid by the respondents to cure the defects in the machine, and the sum of $5,475.86, for profits lost, a total judgment of $17,749.17.

Appellants have set forth, in their brief, their contentions. Under the title "Statement of Facts," appellants have related

their view of the evidence, and have largely omitted the evidence which the court found to be true. Thereafter, follows a heading titled, "The Court Erred in Awarding Judgment to Plaintiffs." Under this title, appellants restate some of the conflicting evidence.

There was ample and sufficient testimony in the record which, if believed by the trial court, would suffice to sustain the judgment. As was said in *Richter* v. *Walker*, 36 Cal.2d 634, 639 [226 P.2d 593]:

"As to the principles governing appellate courts in considering the adequacy of findings to dispose of issues and support a judgment it is a general rule that 'Even though a finding might have been more clearly phrased, it is sufficient if its language is clear enough to indicate what the court intended; and if there are findings sufficient to support the judgment, they are not vitiated by the unintelligibility of others.'"

 Under the title heretofore indicated, the appellants also contend that the respondents, by their conduct, prevented the performance of an act upon which the appellants' obligations depended, and thereafter used the nonperformance of that act as a basis upon which to seek affirmative relief. There was evidence that the machine not only never did work, but that it was so faulty in the inherent design, that it never could be placed in reasonable working order. As respondents have pointed out, it is difficult to understand how the respondents could be said to have in any way prevented the machine from being placed in a workable condition, when such was inherently impossible.

 Appellants' next contention is that the finding that the reasonable value of the machine was only $750, is not supported by the evidence. There was testimony by at least one witness to the effect that the value of the machine was $750, and no more. The trial judge obviously believed such testimony and disbelieved other testimony on the same subject matter. We have heretofore stated the time honored rule in the event of conflicting testimony.

Appellants next assert the court erred in finding that the respondents suffered a loss of profits. The respondents sought damages for the loss of sales because of the respondents' inability to produce sufficient wire to fill the orders, which inability was predicated upon the machine not working. The trial court denied the respondents recovery for such lost profit, if any. The court did grant recovery for the lost profits predicated on the difference between the greater

cost of producing by the manual method, the wire which respondents manufactured and sold between May 1, 1952, and January 31, 1953, and what would have been the lesser cost to have produced that same wire with an automatic machine which the appellants agreed to furnish the respondents. The appellants knew, before they started to make the machine, the nature of the respondents' business and of the respondents' desire to have the machine to reduce the cost of manufacturing the wire and to increase the volume. It was contemplated that only one employee would be needed to operate the machine, as opposed to two employees in the manual operations, and further, that the cost of the plastic would be substantially reduced with the machine.

It is well established that damages may be awarded for loss of profits where such profits can be shown with a reasonable degree of certainty, whether the action be for tort or for breach of contract. Loss of profits, either present or future, may be recovered upon a breach of a contract if such loss is the direct and natural consequence of the breach and the amount thereof can be shown with sufficient certainty. (Civ. Code, § 3300 and § 3301; *Ross* v. *Frank W. Dunne Co.*, 119 Cal.App.2d 690, 700-701 [260 P.2d 104]; *Walpole* v. *Prefab Mfg. Co.*, 103 Cal.App.2d 472, 481 [230 P.2d 36].)

When the defendant by breaching a contract renders it impossible for plaintiff to realize profits, the probable profits may be estimated and an award of damages for loss of prospective profits will be sustained if there is a satisfactory basis for estimating the probable earnings that would have been received if the contract had been performed. (*Sobelman* v. *Maier*, 203 Cal. 1, 9 [262 P. 1087]; *Hartman* v. *San Pedro Coml. Co.*, 66 Cal.App.2d 935, 937 [153 P.2d 212]; see also *Natural Soda Products Co.* v. *City of Los Angeles*, 23 Cal.2d 193, 199 [143 P.2d 12].) Where there is an established business, damages are recoverable for the loss of prospective profits resulting from breach of contract since the working experience of the business affords a reasonable method of determining the loss and such damages are therefore not speculative and uncertain. *Hoag* v. *Jenan*, 86 Cal.App.2d 556, 563 [195 P.2d 451]; *Grupe* v. *Glick*, 26 Cal.2d 680, 692 [160 P.2d 832]; see also note in 104 A.L.R. 157.)

A careful reading of the record in this case indicates that there was abundant evidence from which the trial court

could find as it did. There was no prejudicial error committed by the trial judge.

The judgment is affirmed.

Doran, Acting P. J., concurred.

NOURSE (Paul), J. pro tem.*—I dissent from the majority opinion insofar as it holds that respondents are entitled to damages for loss of profits.

In effect the majority opinion writes into the contract between the parties a warranty that the machine which appellants undertook to manufacture would produce open line wire not only at a cost less than the respondents could produce it under the method they were using and with the machine they were using at the time the contract was entered into, but at a saving of the amount awarded by the trial court as loss of profits.

There is no implied warranty in a contract to manufacture a machine as to what the cost of production by it will be, and the contract here does not contain an express one. The only warranty contained in the contract is one that the machine would produce open line wire at a rate of 3,000 feet an hour or more, and that it would do so for a period of six months.

The damages in question did not arise from the failure of the machine to produce wire at the minimum rate specified in the contract, and in fact the trial court found that respondents did not sustain any damages by reason of its failure so to do.

The damages awarded are based solely upon the difference between plaintiffs' actual cost of producing the wire manufactured by them over a period of nine months and what their witnesses testified that cost would have been if produced by the machine which defendants agreed to manufacture. In other words, the trial court and the majority opinion write into the contract a warranty as to the cost of production by the machine and then find that warranty breached, and award damages because of that breach and not because of the failure of the machine to produce wire at the rate of 3,000 feet or more per hour.

By the other items of damage awarded plaintiffs by the judgment, they were made whole and placed in the same

---

*Assigned by Chairman of Judicial Council.

position as they were in before entering into the contract, for the judgment awards them the entire purchase price paid, less the value of the machine, which the plaintiffs chose to retain, plus the amounts that they expended in attempting to remedy the defects in the machine.

The plaintiffs failed to prove that because of the failure of the machine to produce wire at 3,000 feet per hour, or wire at all, they lost any sales or were prevented from performing any contracts, and the fact that plaintiffs' cost of operation remained the same as it was before they entered into the contract does not constitute any damage flowing from the breach of the contract. This is illustrated by the fact that if the machine had proven capable of producing 3,000 feet of wire per hour *but at a cost per foot equal to or greater than respondents' cost under their old method, no breach of the contract could have been claimed, and no damages could have been awarded.*

It is true that there was evidence that before entering into the contract the plaintiffs made known to the defendants their desire to obtain a more economical method of producing wire, but the contract (which was drawn by the plaintiffs) does not contain any warranty as to cost of operation, and such a warranty could not be proven by parol.

Assuming that there was a breach of warranty, loss of profits is not an item of damage in cases such as this. This is firmly established in this state (see *California Press Mfg. Co.* v. *Stafford Packing Co.*, 192 Cal. 479 [221 P. 345, 32 A.L.R. 114] ; *Burrell* v. *Southern Calif. Canning Co.*, 35 Cal. App. 162 [169 P. 405] ; *Grupe* v. *Glick*, 26 Cal.2d 680, 693 [160 P.2d 832] ; see also anno. 32 A.L.R. 120-122).

In *California Press Mfg. Co.* v. *Stafford Packing Co., supra,* the plaintiff had agreed to manufacture a fishmeal machine for the defendant, which was to have a specified capacity. The plant, when completed, did not have the capacity specified. In an action in claim and delivery brought by the plaintiff, the defendant filed a cross-complaint alleging breach of warranty to furnish a machine of the agreed capacity, and sought damages for loss of profits which would have been realized had the machine been as warranted. In holding that loss of profits was not recoverable, the Supreme Court said (pp. 485 et seq.) : ''The damage to be recovered for not supplying a machine or other article, as agreed, is usually the market value for which another may be procured, and

is not to be founded upon the uncertain and speculative basis of the profit which might have been made from its use. [Citation.] The great weight of authority seems to be that the recovery of profits is possible only under exceptional circumstances, unless the engagement by its very terms discloses them to have been in effect, in whole or in part, a subject matter of the contract. [Citation.] The grounds upon which rest the general rule of excluding profits in estimating damages are concisely stated in *Howard* v. *Stillwell & Bierce Mfg. Co.*, 139 U.S. 199 [35 L.Ed. 147, 11 Sup.Ct. Rep. 500, see also Rose's U.S. Notes], a case almost identical with the one here. Damages were there sought to be recovered for loss of profits due to the failure to construct a flour mill within a certain period and with a given capacity per hour. The court gave three reasons for excluding profits (p. 206): '(1) that in the greater number of cases such expected profits are too dependent upon numerous, uncertain and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profit is ordinarily remote, and not, as a matter of course, the direct and immediate result of the nonfulfillment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a part of the contract itself, nor can it be implied from its nature and terms (citing cases).' . . . The subject was reviewed by another court in a case involving a sale of flour-mill machinery, the contract for which warranted the machinery to have a capacity of a certain number of barrels per day, and it failed to measure up to the stipulated capacity. Damages were sought for loss of profits 'which might have been made.' The court held it was no part of the contract that the plaintiff should make profits by carrying on a business with the machinery which the defendant agreed to erect. It distinguished the transaction from a sale of chattels or of land in which the possible profit is the very object of the contract and is necessarily in the contemplation of the parties, saying: 'When a machinist furnishes machinery to a mill owner it is no part of his engagement that a profitable business shall be carried on with the machinery furnished. Of course if it is defective he is responsible for the damage resulting directly from such defect; but that is a very different thing from the uncertain, remote and speculative profits which may or may not be made in the business to be done.'

[Citation.]'' (See also cases cited in anno. 32 A.L.R. 120, 121, 122.)

The cases cited by the majority to uphold the proposition that damages may be awarded for loss of profits are entirely distinguishable from the present case upon their facts. (*Ross* v. *Frank W. Dunne Co.*, 119 Cal.App.2d 690 [260 P.2d 104], and *Walpole* v. *Prefab Mfg. Co.*, 103 Cal.App.2d 472 [230 P.2d 36], were both cases in which the breach of a contract of distributorship was involved and where the profit to be made from the sale of articles furnished by the defendant was the sole object of the contract insofar as the plaintiff was concerned.

In *Grupe* v. *Glick, supra*, 26 Cal.2d 680, the defendant had agreed to sell certain machines to the plaintiff and had expressly warranted that they were suitable for the purpose of refining oil. The contract gave the plaintiff the exclusive selling rights for the device, and it was contemplated by the parties that he would sell them at retail at an increased price over the price which he was obligated to pay to the defendant for them. Here again the object of the contract, so far as the plaintiff was concerned, was the purchase of these machines and the resale of them at a profit.

In *Natural Soda Products Co.* v. *City of Los Angeles*, 23 Cal.2d 193 [143 P.2d 12], the court did not have before it any question as to damages for the breach of a contract. There the court only held that the profits that the plaintiff might have made from the use of land, of which use it had been wrongfully deprived by the defendant, was evidence of the value of that use.

Even if we assume that plaintiffs were entitled to recover damages of the type which we have been discussing, that is, a loss due to their being unable to reduce their cost of manufacture, then still the damages awarded are beyond those to which they were entitled under the contract. By the express terms of the contract the machine was warranted to operate for a period of only six months, but the damages awarded were based upon the so-called loss of profits over a period of nine months. It is impossible for me to see upon what theory the majority can uphold this award.

I would reverse the judgment with directions to the trial court to enter judgment for the plaintiffs for the sum of $12,291.25, this being the sum of the damages awarded by the trial court as the difference between the value of the

machine delivered and the amount paid by the respondents therefor and the moneys expended by respondents to cure the defects in the machine.

Appellants' petition for a hearing by the Supreme Court was denied June 20, 1956.