**M–S–R PUBLIC POWER AGENCY, a joint powers agency of the State of California, Plaintiff,**

v.

**TUCSON ELECTRIC POWER COMPANY, an Arizona corporation, Defendant.**

**No. CIV 86–521 TUC ACM.**

United States District Court, D. Arizona.

April 18, 1990.

Wallace L. Duncan, Charles F. Holum, Frederick L. Miller, Duncan, Weinberg & Miller, Washington, D.C., Hugh A. Holub, Linden, Chapa & Fields, Tucson, Ariz., for plaintiff.

James W. Colbert, Paul G. McNamara, Suzanne F. Duff, O'Melveny & Myers, Los Angeles, Cal., Leslie Kathleen Lynch, Tucson Elec. Power Co., Tucson, Ariz., for defendant.

COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

MARQUEZ, District Judge.

This matter having gone to trial before the Court, sitting without a jury, the parties having presented their evidence and the Court having considered and heard the parties' arguments with respect to damages, the Court makes the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

The Court entered its Amended Order on liability issues on January 10, 1990, and its Second Amended Order on January 31, 1990. That Order provided, in pertinent part, that TEP had an obligation to act as

agent for M–S–R in connection with M–S–R's attempt to sell energy to SCE in 1985 and that TEP breached that obligation when it advised M–S–R in January of 1985 that it would not do so. The Court also found that TEP breached its scheduling and other obligations to M–S–R, including the covenant of good faith and fair dealing, commencing in 1985 by:

1. refusing to recognize M–S–R's first right to TEP's energy;

2. refusing to permit M–S–R to schedule deliveries on an "on-peak" only basis;

3. refusing to agree to deliver energy to M–S–R above the hourly and seasonal rates in Operating Procedure No. 1 even if additional energy above those rates was available from TEP's coal-fired generators; and,

4. by generally failing to provide M–S–R with the benefits of the parties' agreements.

The Court's Orders left open the question whether M–S–R had suffered any cognizable damages as a result of TEP's breaches of its various obligations. The Court had previously refused to permit M–S–R to present evidence related to coal overcharge calculations and punitive damages, and M–S–R excepted to those rulings. M–S–R did present evidence at trial, primarily through the expert testimony of Mr. Whitfield Russell, that it had suffered various lost profits as a result of TEP's actions. TEP contested that evidence vigorously, primarily through its own expert, Russell Mitchell.

The Court finds that lost profits are a standard measure of damages for breaches of contract. A party may prove its lost profits in various ways, including, as in this case, through expert testimony.

Mr. Russell's study included six different damage claims, broken down into Exhibits A–F within trial Exhibits 195 and 279.[1] M–S–R abandoned Exhibit C after trial, since it was an alternative to the higher claim presented by Exhibit A. This leaves

five Exhibits (A, B, D, E and F) in evidence and to be ruled on by the Court.

■ 1. *Exhibit A.* The Court finds in favor of M–S–R on damage Exhibit A, as presented in trial Exhibit 195. This claim is for profits M–S–R lost as a result of TEP's improperly taking over the 1985–1986 energy sale to Southern California Edison Company ("SCE"). The Court has previously found that TEP had acted and was to continue to act as M–S–R's agent for purposes of the SCE sales. M–S–R had a right to make the "on-peak" sales in the amounts shown by Exhibit A. The Court finds that it is reasonably certain that M–S–R could have made those sales if TEP had acted in accordance with the parties agreement. The Court finds that M–S–R's energy rights were at least as valuable, and as available, as what TEP sold to SCE.

The Court awards M–S–R the full amount shown by Mr. Russell for Exhibit A, $2,705,358, plus interest from the filing of the complaint to the date of payment, as explained below.

2. *Exhibit B.* The Court finds in favor of M–S–R on damage Exhibit B, again as presented in trial Exhibit 195. This claim is for losses which M–S–R suffered by being forced by TEP to sell to El Paso Electric Company at a loss during the "off-peak" hours in the summer of 1985. M–S–R had a right to make profitable "on-peak" only sales. The Court finds it reasonably certain that M–S–R could have made an "on-peak" sale to El Paso or to some other entity at the times and prices in the amounts shown in Exhibit B of trial Exhibit 195.

The Court awards M–S–R $303,138 on the El Paso claim, together with interest from the filing of the complaint, as explained below.

3. *Exhibit E.* The Court also finds in favor of M–S–R on damage Exhibit E of trial Exhibit 195. This claim is based on the profits that M–S–R could have made for "on-peak" sales to Nevada Power Com-

---

**1.** The Court reserved ruling on the admissibility of Mr. Russell's studies during the course of trial. The Court now admits Exhibits 195 and 279 and rules on them in accordance with this Order.

pany in the summers of 1988 and 1989. Again, I find it reasonably certain that M–S–R could have made this kind of sale, to Nevada Power or a comparable entity; M–S–R likely could have realized these profits. M–S–R's energy was at least as valuable as what TEP sold to Nevada Power.

The Court awards M–S–R the full amount of this claim, $593,459, together with interest as explained below.

■ 4. *Interest.* The Court, as noted, awards M–S–R prejudgment interest on the claims shown by damage Exhibits A, B and E. The Court has previously determined that California law applies to this case. California law allows prejudgment interest in contract actions from the date of the filing of the complaint. *See* Cal.Civ.Code § 3287(b). Both prejudgment interest and post-judgment interest are calculated at 7% per annum.

While the award of prejudgment interest is discretionary with the Court, a full award of interest is appropriate in this case. Without an award of interest, TEP would benefit further by having litigated this case. The claims in Exhibits A and B were essentially liquidated as of the filing of the complaint, so interest should be calculated from the filing of the complaint, or April 1, 1986, to the date of TEP's payment. The Nevada Power claim (Exhibit E) arose later. The interest on that amount should be calculated from two months after the TEP sales to Nevada Power occurred, in accordance with the parties' normal billing practices. Mr. Russell's damage exhibits in trial Exhibit 195 include the proper award of interest through October, 1989. These same interest calculations should simply be carried forward to the date of payment.

5. *Exhibits D and F.* M–S–R claims as a portion of its damages herein the profits that it contends that it would have earned on sales to:

a. various Southern California municipalities, known as the Edison Resale Cities, under the terms of Special Condition 12 in the tariffs governing the relationship between those municipalities and their princi-

pal outside supplier of electricity, Southern California Edison Company ("Edison"); and,

b. the Salt River Project. For each putative sale, M–S–R asserts that, if TEP had delivered energy to it in accordance with its rights under the Interconnection Agreement (as those rights have been determined by this Court), M–S–R would have been able to sell the nonfirm, coal-fired, surplus energy specified in Service Schedule B.5 to those potential purchasers in lieu of the firm power that they were, and are, buying from other sources.

■ 6. M–S–R has no entitlement to firm power as traditionally defined, under Service Schedule B.5 of the Interconnection Agreement. The energy promised in that schedule is expressly designated to be non-firm. The nature of TEP's generating system and the load requirements of that system are such that interruptions of this nonfirm energy are most likely to occur during the peak hours of the summer months which is the period when wholesale customers, such as the Edison Resale Cities and the Salt River Project typically have the greatest need for the energy. M–S–R has failed to carry its burden to sustain its claims that the attributes claimed by M–S–R to make Schedule B.5 energy "essentially firm" change the nature of Schedule B.5 energy as non-firm, surplus coal-fired energy or make that energy "essentially firm" and that these entities would have purchased M–S–R power.

7. M–S–R's "first right" is limited to coal-fired, surplus energy. The Court is not persuaded by the evidence that prospective firm power customers would have accepted M–S–R's energy, regardless of its attributes, as a substitute for traditional firm power. This is true even though TEP did have an obligation to maintain resources sufficient to deliver M–S–R's energy at least 95% of the hours each year.

8. The availability of gas turbines under Schedule B.6 does give M–S–R some ability to increase the reliability of deliveries of Schedule B.5 energy by using the turbines as a "back-up" source of energy. The use

of the gas turbines for such a purpose is prohibitively expensive. To be available as a back-up resource, the gas turbines must be reserved by M–S–R at a cost of one dollar per kilowatt of capacity per day. The Court is not convinced that a firm power purchaser would have agreed to this mechanism.

9. Schedule A Emergency Energy provides no enhancement to the reliability of Schedule B.5 energy. TEP is obligated to provide such Emergency Energy only as available, and TEP is the sole judge of availability. Deliveries of Emergency Energy are at TEP's discretion.

10. The evidence was that M–S–R's experience in the marketplace was that Schedule B.5 energy was not, and would not, be perceived by prospective purchasers as competitive with firm power as traditionally defined. From the fall of 1982 until January 1985, when the dispute arose, TEP delivered energy to, or for, M–S–R in accordance with M–S–R's requests and met, or exceeded, all of M–S–R's entitlements under the Interconnection Agreement. During that time, M–S–R attempted to sell its energy to various purchasers, including certain of the Edison Resale Cities. M–S–R was never able to persuade any such prospective purchaser, except Edison, to view its Schedule B.5 energy as the equivalent of firm power, even with the availability of the gas turbines.

11. In addition to persuading the Edison Resale Cities that Schedule B.5 energy was equivalent to the firm power that they were buying from Pacific Gas & Electric Company, any sale to the Resale Cities under Special Condition 12 would require:

a. The concurrence of Edison that the outside resource being imported is a firm resource;

b. firm transmission for delivery of the energy to the Resale Cities; and,

c. timely notice to Edison of the intended importation of power from the outside resource.

The evidence does not establish that any of these conditions were, could or would have been met by an M–S–R sale of Schedule B.5 energy. M–S–R has not shown, by a preponderance of the evidence, that the Resale Cities and Edison would have purchased the energy from M–S–R.

12. All parties have conceded that Special Condition 12 requires firm transmission for the resource to be imported and that the Resale Cities did not possess the requisite transmission rights. The Court is not persuaded that the necessary transmission was available.

13. Under Special Condition 12, an Edison Resale City must give at least eighteen months notice of an intention to import power from an outside resource, which notice can only be given in odd numbered years. While there appears to be no penalty to a Resale City that gives notice and then fails to utilize the outside resource, it is unlikely that a Resale City would have given such notice respecting M–S–R's energy prior to the time that it could reasonably expect that the cost of such energy would be below the cost of power being sold by Edison itself. The evidence, including plaintiff's own computations, shows that M–S–R's cost of energy exceeded Edison's charge to the Resale Cities until January of 1988. If notice had been given at the first available date thereafter, sales could not have begun prior to January of 1991.

14. In addition to persuading the Salt River Project that Schedule B.5 energy is equivalent to the firm power that it is purchasing from TEP, any sale by M–S–R to the Salt River Project would likely require:

a. the ability to deliver the energy at the points of interconnection required by the Salt River Project; and,

b. the ability to deliver energy for the period of time required by the Salt River Project.

M–S–R has failed to carry its burden to show either requirement is, was, or would have been met by M–S–R.

15. The Salt River Project has contracted with TEP for a sale of firm power through the year 2011 with the principal delivery point being the Coronado switchyard. The evidence indicates that that

power contract was intended to replace facilities that the Salt River Project had planned for construction at Coronado. The contract specifies Coronado as the principal delivery point. There is no evidence to show, and nothing from which it is reasonable to even assume, that the Salt River Project would have agreed to a shorter term sale with no deliveries at Coronado. M–S–R has no delivery rights at Coronado, and its entitlement to energy from TEP ends in April 1995.

## CONCLUSIONS OF LAW

1. M–S–R must prove both the fact and the amount of damages that it claims to have suffered. *See Walpole v. Prefab Manufacturing Co.*, 103 Cal.App.2d 472, 230 P.2d 36 (1951). Although the parties disagree as to the standard of proof, both agree that M–S–R has the burden of proof and that, at a minimum, it must prove its claims with reasonable certainty. *See* Restatement (Second) of *Contracts*, § 352 and Comment B (1981).

2. M–S–R has met its burden with respect to the sales set forth in paragraphs 1, 2 and 3 herein (Exhibits A, B and E).

3. M–S–R has failed to meet its burden of proving that, but for TEP's contractual breaches, M–S–R would have made the sales to the Edison Resale Cities or to the Salt River Project postulated in its damage claims, or that it would have made any similar sales to prospective purchasers of firm power.

IT IS ORDERED THAT M–S–R's claims for damages for such sales are hereby denied.

IT IS FURTHER ORDERED that the parties shall each bear their own costs.

IT IS FURTHER ORDERED that judgment be entered in accordance with this Order.